473 F.2d 923
 The CITY OF NEW YORK et al., Plaintiffs-Appellants,
v.
Elliott L. RICHARDSON, as Secretary of Health, Education and
Welfare of the United States, et al., Defendants-Appellees,
Ralph G. Caso, individually and as County Executive of
Nassau County, et al., Plaintiffs-Intervenors-Appellants, H.
Lee Dennison, individually and as County Executive of
Suffolk County, et al., Plaintiffs-Intervenors-Appellants,
Edwin G. Michaelian, individually and as County Executive of
Westchester County, et al., Plaintiffs-Intervenors-Appellants.
 Nos. 300, 486, 487, 488, Dockets 72-1854, 72-2265, 72-2266, 72-2267.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 9, 1973.
Decided Jan. 26, 1973.
 
 Norman Redlich, Corp. Counsel for City of New York (Edmund B. Hennefeld, Mary P. Bass, New York City, of counsel), for New York City appellants.
 Whitney North Seymour, U. S. Atty., S. D. New York (Joel B. Harris, Taggart D. Adams, Asst. U. S. Attys., of counsel), for Federal appellees.
 Joel Lewittes, Asst. Atty. Gen. of N. Y. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen. of N. Y., of counsel), for appellee State Commissioner.
 Melvin Tannenbaum, Deputy County Atty. of Suffolk County, Riverhead, N.Y. (Joseph Jaspan, County Atty., Nassau County, George W. Percy, Jr., County Atty., Suffolk County, John J. S. Mead, County Atty., Westchester County), for intervenors-appellants.
 Before LUMBARD, KAUFMAN and MANSFIELD, Circuit Judges.
 IRVING R. KAUFMAN, Circuit, Judge:
 
 
 1
 This sprawling, multi-party, multi-claim appeal, presents a broadside constitutional attack upon certain provisions of the Social Security Act of 1935, 42 U.S.C. Sec. 301 et seq., and New York State's Social Services Law, See New York Social Welfare Law (McKinney 1966 and Supp.1972) particularly those provisions concerned with the financing and reimbursement policies established by the Acts. Plaintiffs are the City of New York, and three individuals-John V. Lindsay, The Mayor of the City of New York, Jule Sugarman, the Commissioner of Social Services of the City of New York, and Ola Bryant, a taxpaying citizen and resident of New York City. The federal defendants are the Secretary of Health, Education and Welfare of the United States, the Secretary of the Treasury of the United States, and two regional officers of HEW. The state defendant is the Commissioner of Social Services of the State of New York. The district court granted motions to intervene as parties plaintiff in behalf of Westchester, Nassau and Suffolk counties, their County Executives, and other county officials,[1] in their individual and official capacities.
 
 
 2
 Invoking the protection of the Fifth, Ninth, Tenth and Fourteenth Amendments, as well as the General Welfare Clause of Article I, Section 8, Clause 1 of the Constitution, and various unenumerated safeguards-such as the right to travel-thought to inhere in that document, plaintiffs sought declaratory, injunctive and other appropriate relief, and the convocation of a three-judge court. Judge McLean, after motion by the federal and state defendants to dismiss for failure to state a claim for relief, and for lack of subject matter jurisdiction, dismissed the complaint. This appeal followed.
 
 I.
 
 3
 Public assistance laws, as incorporated in the Social Security Act, in rules and regulations of the Department of Health, Education and Welfare, and in various state social service programs, present as complex a legislative mosaic as could possibly be conceived by man. The provisions complained of here, which appear to contain, as far as we have been able to determine, no traps for the unwary, present the following pattern.
 
 
 4
 The Social Security Act provides, inter alia, for public assistance to the aged, Title I, 42 U.S.C. Sec. 301 et seq., to families with dependent children, Title IV, 42 U.S.C. Sec. 601 et seq., to the blind, Title X, 42 U.S.C. Sec. 1201 et seq., and to the permanently and totally disabled, Title XIV, 42 U.S.C. Sec. 1351 et seq. Funds provided in accordance with the Social Security Act are not distributed directly to individuals eligible for assistance; instead, as part of what has been called a "scheme of cooperative federalism," King v. Smith, 392 U.S. 309, 316, 88 S. Ct. 2128, 20 L.Ed.2d 1118 (1968), federal funds are made available on a matching-fund basis, for administration by the states. No state is required to participate in any program offered under the Social Security Act, but those states that wish to receive federal financial aid for local public assistance must submit to the Secretary of HEW, and have approved by him, a state plan for such assistance. Each plan, to obtain approval, must comply with certain provisions of the Social Security Act and with rules and regulations issued by HEW. Thus, subject to certain limited exceptions, a state plan will not be approved unless it provides "for the establishment or designation of a single state agency with authority to administer or supervise the administration of the plan." 45 C.F.R. Sec. 205.100(a) (1). The plan must be in effect "on a statewide basis in accordance with equitable standards for assistance and administration that are mandatory throughout the State." 45 C.F.R. Sec. 205.120(a). State funds must be used for both assistance and administration and on no account may State participation total less than 40% of the non-federal share of the total expenditure, 45 C.F.R. 205.130(a) (1), (c). There is no requirement that local governments contribute to the cost of a state's welfare expenditure, but "if there is local financial participation there [must] be a method of apportioning State and Federal funds among the political subdivisions of the State on an equalization or other basis that will assure that lack of funds from local sources does not result in lowering the amount, duration, scope, or quality of care and services or level of administration under the plan in any part of the State." 45 C.F.R. Sec. 205.130 (c) (2).
 
 
 5
 States submitting an approved plan to the Secretary of HEW may choose between two reimbursement formulae. The first of these, see 42 U.S.C. Secs. 303, 603, 1203, 1353, 1383, is based upon a sliding percentage calculation of certain fixed dollar allotments for each of the four public assistance programs covered by the Social Security Act. The second, the "Medicaid" formula, see 42 U.S.C. Sec. 1318, takes into account not fixed but actual payments made by a state for public assistance and is based upon a sliding percentage scale, with a minimum reimbursement level to the states of 50%. The Medicaid formula contains a factor based upon the ratio of the square of the state's per capita income to the square of the per capita income of the nation as a whole. Under this formula relatively "poorer" states are reimbursed at a higher percentage than relatively "richer" states. New York State, whose plan was approved by the secretary of HEW, opted for the Medicaid formula under which the federal government reimburses New York for 50% of its total welfare costs.[2]
 
 
 6
 New York State's approved plan divides the state into geographic social services districts. New York City is one such social service district, see Social Services Law, McKinney's Consol.Laws, c. 55, Sec. 61(1), and is consequently "responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself." Social Services Law Sec. 62(1). The state plan sets standards for eligibility, payments schedules and the conditions of administration, and requires each local social service district to finance its own public assistance needs,[3] subject to the following reimbursement provision in New York Social Services Law, Sec. 153:
 
 
 7
 Reimbursement and advances by the state.
 
 
 8
 1. . . . .
 
 
 9
 There shall be paid to each such [public welfare] district, city or town
 
 
 10
 a. the amount of federal funds, if any, properly received or to be received on account of such expenditures;
 
 
 11
 b. . . . .
 
 
 12
 c. fifty percentum of the amount expended for public assistance and care for local charges, after first deducting therefrom any federal funds properly received or to be received on account thereof.
 
 
 13
 The net effect of the combined federal-state programs is that payments for assistance in federally-aided categories are provided as follows:
 
 
 14
 Federal revenue: 50%
State revenue: 25%
Local revenue: 25%
 
 
 15
 Appellants challenge this financing formula on a number of constitutional grounds and we turn now to a discussion of that challenge.
 
 II.
 
 16
 The five-count complaint filed below presents claims in behalf of both governmental and individual plaintiffs, against both federal and state defendants. We consider, first, all plaintiffs' claims against the federal defendants, then we shall discuss the governmental plaintiffs' claims against the state defendants, and, finally, we shall concern ourselves with the individual plaintiffs' claims against the state defendants.
 
 
 17
 We are told that the constitutional evil that inheres in the Social Security Act is that it "mandates" State and, under New York's approved plan, local governments to share in the fiscal responsibility for public assistance, a problem which, the appellants emphasize, is now strictly "national" in dimension. It is argued, accordingly, that since it is Congress alone that has the power to provide for the general welfare under the Constitution, see Article 1, Section 8, a requirement that local governmental units bear the cost of providing for the general welfare, thereby depriving the States and their political subdivisions of funds necessary to defray the cost of purely local concerns-such as police and educational services, functions reserved to the states by the Tenth Amendment -is unconstitutional.
 
 
 18
 We are fully aware that metropolitan communities, faced with rising costs of local services and declining tax bases, are experiencing severe fiscal overburdening. But it seems clear that the imagination to devise a proper remedy for most of these urban ills must come from the legislative and not the judicial branch of government. The argument so forcefully advanced in this forum against the federal defendants is more properly addressed to the Congress for, even assuming arguendo that the welfare problem is national in character, we can detect no constitutional infirmity in the Congressional scheme embodied in the Social Security Act. We have already noted that the Act provides a mechanism of "cooperative federalism", King v. Smith, supra, in which the states join on a voluntary basis. To be sure, the carrot provided by the federal government in the form of financial aid has proven, in many instances, too tempting to resist. But, to label this type of assistance as a form of coercion or compulsion is to read into the act language and a purpose that are simply not there.
 
 
 19
 Similarly, there is little weight to the argument that the federal government, having once entered the field of public assistance, must assume the entire burden of the nation's welfare expenses. Although Article I, Section 8 does indeed permit Congress to expend funds for the general welfare, United States v. Butler, 297 U.S. 1, 64-65, 56 S.Ct. 312, 80 L.Ed. 477 (1936), the judgment whether to do so, and to what degree, rests with that branch of government. Appellants' argument, if pressed to its logical end, would compel us to require the Congress to pay the full share of local law enforcement or educational expenses, for example, simply because the Congress has seen fit to make some funds available to the states for those purposes.[4] The appellants concede that Congress has not assumed the burden of full financing of these "local" concerns and we see no reason to reach a contrary rule where public assistance is involved.
 
 
 20
 In this light, it becomes more than a matter of legal curiosity that appellants' complaint revives a debate, albeit in somewhat altered form, that was current in the early days of the Social Security Act. We agree with the late Judge McLean, author of the district court's thorough opinion in this case, who noted that when the Act was first challenged,
 
 
 21
 the claim was made that it was unconstitutional because it authorized a contribution by the federal government to programs which were said to be the sole responsibility of the states. That claim was rejected by the Supreme Court. Carmichael v. Southern Coal Co., 301 U.S. 495 [, 57 S.Ct. 868, 81 L. Ed. 1245] (1937); Helvering v. Davis, 301 U.S. 619 [, 57 S.Ct. 904, 81 L.Ed. 1307] (1937); Steward Machine Co. v. Davis, 301 U.S. 548 [, 57 S.Ct. 883, 81 L.Ed. 1279] (1937). It does not follow that because the federal government may validly pay part of the cost, it must therefore pay it all. Granted that the welfare problem is "national" in the sense that it is widespread throughout the country, it is still a problem of caring for people who live in each of the states. The cases cited uphold the scheme of the Act which provides for meeting that problem by cooperation between the nation and the states, with each carrying a part of the load. . . . [T]hese decisions are as good authority for sustaining the statute against the present attack as they were for rejecting the earlier one. Neither extreme position is justified.
 
 
 22
 Nor is there merit to the contention that federal aid to the states, which under a formula based upon a state's per capita income has the effect of furnishing greater percentage aid to "poorer" states than to "richer," constitutes a discrimination against the "richer" states that is so irrational and "unjustifiable as to be violative of due process." Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). "Ability to pay" is a legitimate legislative classification with respect to public assistance and it can hardly be said, although appellants in fact do so, that a state's per capita income is an irrational measure of ability to pay. Even on the assumption that a better reimbursement formula could be devised, we would hardly presume to rule that the constitution requires enactment of that formula. Just so long as the classification is rationally related to a legitimate Congressional objective, the provision is secure against challenge.[5]
 
 
 23
 In sum, the constitutional attack against the Social Security Act presented by these appellants is without merit and fails to state a claim for which relief can be granted. Accordingly, the district court properly dismissed the complaint against the federal defendants, see Rule 12(b) (6) F.R.Civ.P.
 
 
 24
 The city and county plaintiffs' claims against the state defendant were also properly dismissed. Political subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment. The Supreme Court has instructed, see Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933), that "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." Although the validity of this rule as regards challenges to Congressional legislation has been questioned, it remains controlling authority when the challenged statute is the work of a State legislature, see Aguayo v. Richardson, 473 F.2d 1090 (2 Cir. 1973).[6]
 
 III.
 
 25
 We come, finally, to claims raised by the individual plaintiffs against the state defendant, the Commissioner of Social Services of the State of New York. Although the district court denied the application for a three-judge court and dismissed this portion of the complaint for lack of subject matter jurisdiction, we deal first with the substantive merits of the claim, and then with problems of standing and jurisdiction.
 
 
 26
 The challenge presented here is novel and appears to be one of first impression. To best illustrate the nature of the Equal Protection argument advanced in this litigation we may, for the moment, put aside the claims of the county intervenors and focus on the New York City plaintiffs. It is undisputed that the state Social Services Law compels residents of New York City to pay 25% of the cost of public assistance payments made to welfare recipients residing in the city, see New York Social Services Law Secs. 62, 91 and 153. These costs are mandated by authority of the state Legislature, as is the level of payments required to be made to each welfare recipient. The inequity complained of is that the manner in which the state has drawn the boundaries of social service districts tends to discriminate, arbitrarily and without rational justification, against New York City by imposing a disproportionately heavy tax burden upon city residents. Statistics for the year 1969 appear to bear out this claim. Although only 45% of New York State's residents live in New York City, the City is financially responsible for 74% of the state's welfare recipients.[7] 12.52% of the New York City's residents receive public assistance, as against an average of 3.49% for the balance of the state. New York City clearly bears a breater burden of the costs of welfare in the State because it has, vis-a-vis other State social service districts, a proportionately greater percentage of welfare recipients living within its social service jurisdiction.
 
 
 27
 The Equal Protection clause of the constitution requires that any discrimination between individuals, if there be such, must be rationally based and not invidious. The question we must ask is whether the state's decision to distribute the financial burden of public assistance on a geographic basis, which does not take into account gross disparities in the number of welfare recipients residing in each local district and which imposes proportionately greater financial obligations on the taxpaying citizens of certain districts, is reasonably related to a legitimate state objective and thus able to withstand constitutional attack.
 
 
 28
 Although this is indeed the question we ask, we need not fully resolve it at the present time. This issue arises in the context of an appeal from a denial of an application to convene a three-judge court. Our function, upon review of that decision, assuming for the moment no insurmountable jurisdictional obstruction, is simply to inquire whether the question raised is "wholly" or "clearly insubstantial", see Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973); Powell v. Workmen's Compensation Board of the State of New York, 327 F.2d 131, 138 (2 Cir. 1964); Astro Cinema Corp., Inc. v. Mackell, 422 F.2d 293, 298 (2 Cir. 1970); see also, Ex Parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933); California Water Service Co. v. City of Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 867, 82 L.Ed. 1323 (1938) ["The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject."]; and Wright, Law of Federal Courts 191 (2 ed. 1970). If the constitutional question is substantial, further proceedings before a three-judge district court are required. 28 U.S.C. Sec. 2281.
 
 
 29
 Since we deal here neither with alleged violations of fundamental interests, compare Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (interstate travel) and Harper v. Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (voting), with Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972;) (housing not a fundamental interest); nor with suspect classifications, see Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (race) and Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage), we do not subject the statutory provisions of New York's Social Services law to a "strict scrutiny" or "compelling state interest" test. Nevertheless, even a cursory reading of recent Equal Protection cases emanating from the Supreme Court indicates that the traditional "rational relationship" standard, under which "a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it," McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), has been modified. The two-tiered equal protection doctrine seems to have begun to give way to a more graduated, sliding-scale test, see generally, Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for A Newer Equal Protection, 86 Harvard L.Rev. 1 (1972); Note, Legislative Purpose, Rationality and Equal Protection, 82 Yale L.J. 123 (1972); see also, Aguayo v. Richardson, supra. In Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1972), a unanimous Court, in an opinion written by the Chief Justice, applied a more demanding version of the traditional "rational relationship" test and held that a state purpose that clearly had "some legitimacy" still ran afoul of the Equal Protection Clause, Id. at 76, 92 S.Ct. 251. The Court in Eisenstadt v. Baird, 405 U.S. 438, 448, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), announced that a statutory discrimination that concededly had a "marginal relation" to a legitimate state objective was, nevertheless, constitutionally impermissible under the Equal Protection Clause. And in Weber v. Aetna Casualty and Surety Company, 406 U.S. 164, 170, 92 S.Ct. 1400, 31 L.Ed.2d 768, the Court held that legislative discrimination could be justified only upon a showing that the state interest furthered by the statute was "substantial."
 
 
 30
 Clearly, these decisions seem to foreshadow an expanded judicial inquiry under the Equal Protection Clause, although the outer boundary of that inquiry remains ambiguous. The State appellee, however, has not seen fit to offer this Court even a minimally rational explanation for the statutory discrimination which inheres in New York's Social Service Law. This, in itself, suggests that the question presented is sufficiently substantial to merit the convening of a three-judge court.
 
 
 31
 Of course, were the residents of New York City in some way "responsible" for the city's disproportionately large number of public assistance recipients the State might justifiably decide to levy costs where the fault lies or where it could be shown that the locality gained some special benefit or service. But when the issue involves assistance for the aged, the blind, the disabled and the dependent, we believe the concept of "fault" would appear to be irrelevant. Moreover, unrebutted statistics presented by the appellants clearly establish that a large percentage of public assistance recipients residing in New York City have migrated from other states,[8] drawn to New York, perhaps by a dream of a better life but in part, one suspects, by the high level of assistance payments, relative to other states, that obtains throughout New York State.[9] New York City neither controls this payment schedule, nor may it, consistent with the Constitution, interfere with the right of welfare recipients to travel interstate and settle in New York City. Shapiro v. Thompson, supra.
 
 
 32
 We believe, moreover, that the State Social Services program cannot be justified on the ground that it is designed to promote efficiency of administration. Governmental efficiency has never been thought to legitimize unconstitutional discrimination, see Reed v. Reed, supra, at 76; cf. Goldberg v. Kelly, 397 U.S. 254, 264-266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (governmental interest in conserving fiscal and administrative resources does not override welfare recipient's due process right to pre-termination hearing), nor would we expect it to do so in this case.
 
 
 33
 Inasmuch as the state-appellee has not offered any rational justification for a discrimination which results from the joint requirement that the state be divided into geographic districts, and that each district finance 25% of its welfare expenditures, and since the Court does not readily perceive what justifying considerations may have motivated the State legislature to devise a system that appears on the surface discriminatory, we are of the view that the Equal Protection claim advanced here is sufficiently substantial to require the convening of a three-judge district court. Of course, at that time it will be open to the state to present whatever explanation it concludes may preserve the statute in question against constitutional attack.[10]IV.
 
 
 34
 Judge McLean dismissed the complaint of the individual plaintiffs for failure to satisfy the jurisdictional amount of $10,000 required by 28 U.S.C. Sec. 1331. Appellants have suggested that we order a hearing in the district court at which time they would be given an opportunity to substantiate their claim of damages in the amount of $10,000. This option is certainly available on remand.
 
 
 35
 We believe, however, that those plaintiffs who sued in their official capacities stand on a somewhat different footing from the plaintiff Ola Bryant. With respect to standing, those plaintiffs who sued in their official capacities may assert constitutional claims against the state under the rule announced in Board of Education v. Allen, 392 U.S. 236, 241, n. 5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). This is so because of the conflict each of these officials must face between his sworn duty to uphold the Constitution of the United States and his responsibility for administering New York's allegedly unconstitutional Social Services Law. Since it is clear that the district court would have had jurisdiction over this case had these plaintiffs invoked the provisions of 42 U.S.C. Sec. 1983 and its jurisdictional mate, 28 U.S.C. Sec. 1343, we believe it would be wise to allow an amendment of the complaint alleging those sections as a jurisdictional basis.[11]
 
 
 36
 Accordingly, we affirm the district court's dismissal of all the plaintiffs' claims against the federal defendants and the dismissal of those claims asserted by city and county plaintiffs against the state defendant. We remand the claims of those individuals who have sued the state defendant in their official and personal capacities, with instructions to convene a three-judge district court.
 
 
 
 [1]
 Although granted leave to intervene, and given permission to argue orally before the court below, the county plaintiffs did not file their complaints until after Judge McLean rendered his decision in this case. The intervenors filed a timely notice of appeal from the judgment below. They have fully participated in this appeal by briefing the issues and arguing orally before the court. Accordingly, they are bound by our decision today
 
 
 [2]
 The federal appellees' brief states:
 The average monthly payment to a New York AFDC [Aid to Families with Dependent Children] recipient in May 1972 was $71.21. Under the original formula, which is still in use by many states, New York would receive $22 per recipient from the federal government. Under the Medicaid method, New York receives $35.60 per recipient . . . .
 
 
 [3]
 New York Social Services Law, Sec. 91, provides:
 . . . The legislative body of the city social services district shall appropriate the amount necessary for such purpose [public assistance and care] and shall cause taxes to be levied for the amount of such appropriation.
 We stress here that local financing of statewide public assistance programs is not required by the federal statute and New York State, were it so inclined, could decide to bear the full cost of public assistance and still be eligible for a 50% reimbursement from the federal government. Statistics for fiscal year 1970 indicate that sixteen states have assumed the full burden of financing public assistance expenditures. United States Dep't of Health, Education and Welfare National Center for Social Statistics: NCSS Report F-1 (1971).
 
 
 [4]
 See, e. g., 42 U.S.C. Sec. 3701 et seq. (Law Enforcement Assistance) ; 20 U.S.C. Sec. 1 et seq. and 42 U.S.C. Secs. 2000c, 2000d (Educational Assistance)
 
 
 [5]
 See, e. g., Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971)
 A statutory classification in the area of social welfare is consistent with the Equal Protection Clause of the Fourteenth Amendment if it is "rationally based and free from invidious discrimination." Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491. While the present case, involving as it does a federal statute, does not directly implicate the Fourteenth Amendment's Equal Protection Clause, a classification that meets the test articulated in Dandridge is perforce consistent with the due process requirement of the Fifth Amendment. Cf. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884.
 
 
 [6]
 Since no valid claim has been stated by the city and county plaintiffs, their pendent claim under the "home rule" provisions of the Constitution of the State of New York was properly dismissed by the district court for lack of jurisdiction. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)
 
 
 [7]
 New York City's estimated population in 1969 was 8,110,000; New York State's estimated population was 18,262,000, see New York State Statistical Yearbook (1970), but see The World Almanac (1972): census figures for 1970 indicate that New York City's population is approximately 7,868,000. 1,016,405 persons received public assistance benefits in New York City as against 354,742 persons in the remaining social service districts of the State. By the end of November, 1972, New York City welfare rolls accounted for 1,260,135 out of 1,786,814 persons receiving public assistance in the State, i. e., slightly more than 70%. The New York Times, January 21, 1973, at 21, col. 1
 
 
 [8]
 In 1968, 78.2% of the mothers receiving AFDC payments in New York City were born out of state. U. S. House of Representatives, 91st Congress, 1st Session, Comm. on Ways and Means. Report of Findings of Special Review of Aid to Families with Dependent Children in New York City, Table 20 (1969)
 
 
 [9]
 Consider the following statistics:
 Average Monthly Payments (December 1970)
-------------------------------------------------------------------------------
 Old Age Aid to Aid to the Aid to the
 Assistance Dependent Blind Permanently and
 Children Totally Disabled
National ............ $ 78 $187 $104 $ 97
New York
 State ............. $105 $292 $136 $127
 Statistics for New Jersey and Connecticut, states adjacent to New York, and for California, a comparably large state, appear below:
 New Jersey ... $ 78 $253 $100 $107
Connecticut .. $101 $242 $101 $130
California ... $117 $193 $160 $139
 See United States Department of Commerce, Statistical Abstract of the United States, at 294 (1971).
 
 
 [10]
 One case of marginal relevance to the issue before us is Hargrave v. McKinney, 413 F.2d 320 (5 Cir. 1969), where the Court of Appeals reversed a denial by a district court judge of an application for a three-judge district court to consider the constitutionality of a Florida statute providing that any county imposing upon itself more than 10 mills ad valorem property taxes for educational financing would be ineligible to receive state funds for the support of its public schools. The plaintiffs argued that the tax limitation statute unconstitutionally discriminated against property-poor districts by preventing them from spending as much as rich districts for education. Noting that the argument was novel, the Court of Appeals concluded that the claim was "substantial" within the meaning of Ex Parte Poresky, supra
 On remand, the three-judge district court held the Florida statute unconstitutional, Hargrave v. Kirk, 313 F.Supp. 944 (M.D.Fla.1970). Although the court was invited to apply a strict "compelling state interest" Equal Protection test, on the theory that the statutory classification denied equality of educational opportunity, an interest the plaintiffs termed "fundamental," the court declined to do so. In its view, Florida's Millage Rollback Act -the statute in question-failed even to satisfy the "rational relationship" test. The decision was vacated and remanded on other grounds in Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971).
 The compulsion to tax in the instant case is clearer than the compulsion not to tax involved in Hargrave. The appellants here have argued that the relatively heavier public assistance tax burden which they sustain deprives them of revenues needed for local services such as education, sanitation and police or, at least, makes raising additional funds for these purposes difficult. In light of certain recent cases and trends, see, e. g., Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971); Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (W.D.Texas 1972), probable jurisdiction noted, 406 U.S. 966 (1972); but cf. McInnis v. Shapiro, 293 F.Supp. 327 (N.D.Ill.1968), aff'd sub nom. McInnis v. Ogilvie, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 (1969) (without opinion) ; Burruss v. Wilkerson, 301 F.Supp. 1237 (W.D.Va.1968), aff'd 397 U.S. 44, 90 S.Ct. 812, 25 L.Ed.2d 37 (1970) (without opinion), it would be unwise to foreclose the plaintiffs from presenting their claim in its strongest posture at this time. We fully recognize that the cases cited in this footnote are not controlling, and are only generally relevant to the issue presented whether the constitutional question is "insubstantial." In directing the convening of a three-judge court we intimate no views on the ultimate merits of the constitutional claim to be adjudicated by that court.
 
 
 [11]
 In the event Ola Bryant is unsuccessful on remand in grounding her claim on 28 U.S.C. Sec. 1331, we leave for the three-judge court to determine whether her status would allow her to state a claim under 42 U.S.C. Sec. 1983