George HOGAN et al., Plaintiff,

v.

Patricia HARRIS et al., Defendants.

Civ. A. No. 80–883–T.

United States District Court,
D. Massachusetts.

Nov. 21, 1980.

William H. Simon, Legal Services Institute, Jamaica Plain, Mass., Mark Coven, Greater Boston Elderly Legal Services, Boston, Mass., Gill Deford, National Senior Citizens Law Centre, Los Angeles, Cal., for plaintiff.

Thomas Miller, Asst. Atty. Gen., Boston, Mass., for Commonwealth of Mass.

John B. Maclay, Penny Quinn, U. S. Dept. of Justice, Civil Division, Washington, D. C., Donald R. Anderson, Asst. U. S. Atty., Boston, Mass., for United States.

## OPINION

TAURO, District Judge.

This action challenges fundamental components in the "complex legislative mosa-

ic"[1] of federal–state public assistance.[2] Plaintiffs are a group of aged and disabled Social Security recipients. Their complaint is that, under the Massachusetts Medicaid program, they receive substantially less income for basic nonmedical living expenses than do identically situated aged and disabled persons whose source of support is Supplemental Security Income (SSI). This disparate treatment, they allege, creates an irrational classification which violates constitutional guarantees of equal protection.

Plaintiffs' grievances are best understood by examining the plight of Mr. and Mrs. Hunter, two of the named plaintiffs. Mr. Hunter worked for 41 years as a longshoreman, bartender, hotel clerk, and clothing alteration checker. He paid Social Security taxes during that period, and he and his wife now receive approximately $534.00 per month in Social Security benefits.

As Social Security beneficiaries, the Hunters are not automatically eligible for Medicaid assistance. Rather, the Massachusetts Medicaid program requires that they pay their own medical bills until they have "spent down" their income to a point where they have only $400.00 per month available for nonmedical living expenses. When they have done so, they become eligible for Medicaid assistance.

SSI beneficiaries, on the other hand, are not subject to such a "spend down" requirement before receiving Medicaid assistance. Instead, SSI recipients receive a "basic need" subsistence of $513.00 per month, in addition to having their medical needs met by Medicaid. This means that the Hunters have approximately $100.00 less per month to spend on food and clothing than do their SSI counterparts.

The irony of the Hunters' situation becomes apparent when one realizes that if their income were one dollar less per month, they would be considered eligible to become SSI beneficiaries. As such, they would receive full Medicaid coverage and be allowed $513.00 per month for their nonmedical living expenses. In other words, as SSI recipients they would not have to "spend down" to a $400.00 per month level in order to have their medical bills covered by Medicaid. The bottom line impact on the Hunters is that they, unlike their SSI counterparts, must exist at a support level roughly 20% below the basic need standard established under SSI.

By their cross motions for partial[3] summary judgment, the parties raise the issue as to whether the Massachusetts Medicaid program is unconstitutional insofar as it forces Social Security recipients to "spend down" approximately $100.00 per month below Supplementary Security Income levels before becoming eligible to receive medical benefits.

## I. *Background*

The classification at issue here arises from the convergence of three assistance programs: Old Age, Survivors, and Disability Insurance (OASDI), more commonly known as Social Security;[4] SSI;[5] and Medicaid.[6]

### A) *Social Security*

Social Security, the basic social insurance program established by the Social Security Act of 1935, provides income security for the aged, the disabled, and their survivors and dependents. Essentially, eligibility depends on the existence of a disability, 42 U.S.C. § 423(a)(1), or the attainment of age 62, 42 U.S.C. § 402(a), and a sufficiently

---

1. *City of New York v. Richardson*, 473 F.2d 923, 926 (2d Cir.), *cert. denied sub nom. Lavine v. Lindsay*, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973).

2. Plaintiffs' causes of action arise under 42 U.S.C. § 1983, and the Fifth and Fourteenth Amendments. They assert jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3. Count III of the complaint, challenging Massachusetts' use of a six–month accounting period in determining medically needy eligibility, is not put in issue by these cross motions.

4. 42 U.S.C. §§ 401 et seq.

5. 42 U.S.C. §§ 1381 et seq.

6. 42 U.S.C. §§ 1396 et seq.

long history of payment of Social Security tax. 42 U.S.C. § 423(c)(1) (disability); § 414(a) (old age).

### B) *Supplemental Security Income*

SSI, enacted in 1973 as Title XVI of the Social Security Act, is a cash assistance program of last resort for aged, blind, or disabled people who, for whatever reason, lack sufficient income to meet their basic needs. 42 U.S.C. §§ 1382c(a); 1382. Unlike Social Security, SSI is available without regard to work history or tax payments. An individual who is aged, blind, or disabled need only establish financial need in order to be eligible for SSI benefits. Financial need is established if an individual's income falls below SSI income standards. Benefits are provided sufficient to raise the individual's income to the minimum SSI level. 42 U.S.C. §§ 1382(b), 1382(e)(2), 1382a.

A basic minimum SSI level is set by Congress. But the states may, and in some cases must, raise the level by supplementing the federal benefits with state funds. *See* 42 U.S.C. § 1382e.

### C) *Medicaid*

Medicaid, a federal–state program established in 1965, pays for the cost of medical treatment for certain categories of the needy. The states formulate individual Medicaid plans and administer the programs, subject to federal statutory and regulatory requirements. 42 U.S.C. § 1396a. After paying out benefits, the states receive federal reimbursement for a certain percentage of total cost. 42 U.S.C. § 1396b.

The two basic groups of eligible Medicaid recipients are the "categorically needy" and the "medically needy." The categorically needy consist of recipients of SSI and Aid to Families with Dependent Children (AFDC). 42 U.S.C. § 1396a(a)(10)(A). The medically needy include those whose income is too high to qualify them for AFDC or SSI, but too low to pay necessary medical expenses. 42 U.S.C. § 1396a(a)(10)(C).

States which participate in Medicaid must provide benefits to the categorically needy. 42 U.S.C. § 1396a(a)(10)(A). On the other hand, participating states may or may not provide for the medically needy. 42 U.S.C. § 1396a(a)(10)(C).

In 1967, Congress added the provision which has led to the discrimination complained of here, namely, a limit on federal reimbursement for aid to the medically needy. Under 42 U.S.C. § 1396b(f)(1)(B), the state may set maximum income levels for the medically needy no higher than 133⅓ percent (i. e. four thirds) of the AFDC income standards in force in that state.[7] Medically needy individuals with income higher than four thirds the AFDC standard may still receive benefits, but they must first "spend down" the difference between their income and the four–thirds level on medical expenses. In contrast, SSI recipients automatically receive full Medicaid benefits without spending down. 42 U.S.C. § 1396b(f)(4). In Massachusetts, the result is that Social Security recipients with high medical expenses have less income to meet nonmedical living expenses than do SSI beneficiaries. This is so even though SSI payments are intended to be geared at a "basic need" level.

### II. *Facts*

The circumstances of the named plaintiffs illustrate the operation and impact of these programs. Plaintiffs George and Pearl Hogan have a combined monthly income of $646.60 in Social Security benefits. Mr. Hogan has a large cavity in his chest from surgical treatment of tuberculosis, and requires a daily antibacterial dressing change, which must be performed by a trained nurse. The cost of this treatment, along with the necessary medications and supplies, amounts to more than $1000 a month.

Henry and Celia Beberman together receive $668.10 a month in Social Security benefits. Mrs. Beberman, a 77–year–old

---

7. Strictly speaking, the state may set the maximum income level higher, but it will receive no federal reimbursement for the higher amount.

victim of diabetes, osteomyelitis, deafness, and other ailments, needs daily assistance from a home health aid, and weekly visits by a nurse. Her medical expenses exceed $1300 a month.

Plaintiffs George and Cecilia Hunter have a combined monthly income of $534.70 in Social Security benefits. Mr. Hunter, 68 years of age, suffers from glaucoma and is a double amputee confined to a wheelchair. He must travel to Boston City Hospital twice a month for medical treatment, and can get there only by ambulance, at a cost of $162 per trip. In addition, he requires medication costing more than $50 a month.

Under the Massachusetts Medicaid Plan, the medically needy must pay their own medical expenses until they have spent down their income to $400 a month (i. e. four thirds of the Massachusetts AFDC standards for a family of corresponding size).[8] The Massachusetts SSI (i. e. categorically needy) eligibility levels, however, are considerably higher than $400 a month. Aged couples receive a maximum of $513.78 a month and couples with one aged individual and one disabled individual are eligible for $504.04 a month.

The basic federal SSI payment level is $312.30 a month. In addition, Massachusetts provides a supplemental benefit of $201.48 for an aged couple, and $191.74 for a disabled/aged couple. The disparate impact on the plaintiffs results because of the interplay between the four–thirds limit on federal reimbursement for the medically needy and the generous state supplements that Massachusetts provides to SSI recipients.

That impact means that, in order to be eligible for Medicaid, plaintiffs must "spend down" their income[9] on medical expenses to a point where they have only $400 per month available for food, clothing and shelter. To put it another way, Massachusetts allows Social Security recipients in plaintiffs' circumstances $400 a month for nonmedical expenses. If instead the plaintiffs were ineligible for Social Security, or if their Social Security payments were insufficient to put them above the SSI level, they would be automatically eligible for Medicaid as categorically needy SSI recipients. Massachusetts would then allow them $513.78 (or $504.04 in the case of the Hogans) a month for nonmedical living expenses.

As has been pointed out, the Hunters provide a particularly vivid example of this anomaly. Mr. Hunter worked for 41 years in a variety of jobs, and paid Social Security taxes during that period. He and his wife now receive $534.70 in Social Security benefits, or, when reduced by the $20 income disregard,[10] $514.70 a month. This is 92 cents higher than the applicable SSI income level of $513.78. And so, if the Hunters' income were literally pennies less, they would be eligible for SSI. As SSI beneficiaries, their medical bills would be fully covered and they would have $100 per month more to spend on basics such as food, clothing and shelter.[11]

An especially bizarre aspect of this anomaly is that individuals with long histories of paying Social Security taxes must live on less than those who have paid little or no tax. If Mr. Hunter, for example, had not worked and paid taxes long enough to become eligible for Social Security payments, he and his wife would have become eligible

---

8. In reality, the medically needy are allowed to keep $420 a month for nonmedical expenses, but $20 a month is disregarded in computation of medically needy income levels. The same $20 disregard applies to calculation of SSI benefits.

9. The Hogans must spend $246.60 a month, the Bebermans must spend $268.10 a month, and the Hunters must spend $134.70 a month for medical care before receiving any Medicaid benefits.

10. See note 8 *supra*.

11. The figures cited in this section reflect the benefit levels and income standards in force at the time of the complaint. On July 1, 1980, the annual cost-of-living increases went into effect. The discrepancy between medically needy and categorically needy levels is apparently widening–the medically needy level is rising at a rate of 6 percent while the categorically needy level is increasing at a 10 percent rate.

for SSI, and would have $100 a month more for nonmedical living expenses than they do now.

### III. *Discussion*

Citing these apparent paradoxes, the plaintiffs[12] challenge the Massachusetts Medicaid Plan. Seeking declaratory and injunctive relief, they argue that the discrepancy between medically needy and categorically needy income levels violates the Fourteenth Amendment equal protection clause and the equal protection guarantee inherent in the Fifth Amendment due process clause.

▮▮ Under Fifth[13] and Fourteenth Amendment equal protection analysis, the legislative branch has traditionally enjoyed wide latitude in the areas of economic and social welfare. *See, e. g., Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Some courts have sought to raise the standard of review in public assistance cases.[14] The weight of authority, however, requires that welfare classifications, in the absence of a suspect classification or the infringement of a fundamental right, meet only a minimum rationality test. *See, e. g., Weinberger v. Salfi*, 422 U.S. 749, 768–70, 95 S.Ct. 2457, 2468–69, 45 L.Ed.2d 522 (1975); *Hagans v. Lavine*, 415 U.S. 528, 529, 94 S.Ct. 1372, 1375, 39 L.Ed.2d 577 (1974); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Hence, equal protection does not demand that classifications be made with "mathematical nicety."

12. In their complaint, plaintiffs seek certification to represent a class including all OASDI recipients who: (a) reside in Massachusetts; (b) are disabled or 65 years of age or over; (c) are ineligible for SSI because of their income; and (d) have medical expenses, not subject to payment by a third party, which exceed the difference between their countable incomes and the applicable SSI income standard. Complaint, ᶜ 10(a). Whether or not plaintiffs still purport to represent a class is unclear; this court will assume that they do not. The declaratory relief granted here, however, will necessarily extend to all of the would-be class members.

13. The Fifth Amendment due process clause is now interpreted to encompass traditional Fourteenth Amendment equal protection principles.

*Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). What it does require is that "the goals sought [be] legitimate, and the classification adopted [be] rationally related to the achievement of those goals." *Richardson v. Belcher*, 404 U.S. 78, 84, 92 S.Ct. 254, 258, 30 L.Ed.2d 231 (1971).

Defendants, focusing on the legislative history behind the four–thirds limit on federal reimbursement, cite two main legislative goals justifying the classification at issue here: (1) saving federal money, and (2) assuring that assistance to the medically needy would not supplant private health insurance or Medicare.

▮▮ The goal of saving tax dollars is certainly noble. But the assertion of that goal as a legitimate basis for disparate treatment invites careful examination. The government can always seek to justify disparate treatment by pointing out the benefits to the public in terms of cost savings. In one sense such a defense would never fail, because it always saves money to deny benefits to a disfavored group. ' *See Morales v. Minter*, 393 F.Supp. 88, 100 (D.Mass. 1975); *Doe v. Plyler*, 628 F.2d 448 (5th Cir. 1980). But the standard of minimum rationality, if it is to mean anything at all, must be cloaked with a fabric of at least some substance. Equal protection demands that even limited financial resources be rationally allocated so that needy individuals in like circumstances are treated with parity.

*See, e. g., Mathews v. deCastro*, 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 432, 50 L.Ed.2d 389 (1976); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975).

14. The Third Circuit has argued that the right to welfare benefits is "important" even if not fundamental, *see Medora v. Colautti*, 602 F.2d 1149, 1154 (3d Cir. 1979), and that the aged and disabled constitute a "sensitive but nonsuspect class" deserving heightened judicial protection. *See id.* at 1154–55 n. 12.

It has also been noted that welfare classifications involve benefits that make up the sole source of support for many in our society. *See Morales v. Minter*, 393 F.Supp. 88, 97 (D.Mass. 1975).

■ Measured against this standard, the statutory scheme falls short of the constitutional requirement that it have a rational basis. By definition, medically needy persons and categorically needy persons differ only in the amount of their respective incomes. It would be rational, therefore, to require the medically needy to spend down their income on medical expenses to the SSI basic need level before becoming eligible for Medicaid benefits. That approach would provide Medicaid assistance to all needy people having a certain basic level of income support for nonmedical living expenses. There would be no advantaged or disadvantaged class of Medicaid beneficiary.

The Massachusetts Medicaid program, however, does not operate in this manner. Medically needy individuals must spend down until their income reaches an arbitrary point wholly unrelated to the SSI standards of basic need eligibility. In practical terms, this means that, in order to obtain Medicaid benefits, Social Security recipients must do with less food, clothing and shelter than their SSI counterparts.

Defendants argue that the medically needy are by definition wealthier than the categorically needy, and that it is rational, therefore, to favor the categorically needy in allocating Medicaid funds. But this argument ignores reality by looking to plaintiffs' gross income rather than the number of dollars they have available to feed themselves after medical expenses. The plaintiffs here are medically needy persons whose necessary and unreimbursed medical expenses exceed the difference between their incomes and the SSI basic need eligibility level. In reality, the income available to them for basic nonmedical needs is their gross income minus their medical expenses. In each of their cases, the money they have left after medical expenses is substantially below the basic need standard recognized by SSI. It is hardly rational for the defendants to rely on the fact that, if the

plaintiffs were healthy, they would have greater income than SSI recipients. If plaintiffs were healthy, they would not be seeking relief from this court.

Defendants also contend that, even if the statutory scheme creates some inequities, Congress rationally accepted these inequities as the price to be paid for conserving fiscal resources. This argument raises an important issue. Did Congress balance opposing considerations and then knowingly and rationally create the classification complained of here? The resolution of this issue requires an examination of the legislative history behind the four–thirds rule.

When Congress enacted the Medicaid program in 1965, it clearly meant to prohibit the states from forcing anyone to spend down below categorically needy income standards:

> In no event, however, . . . may a State require the use of income and resources which would bring the individual's income below the amount established as a test of eligibility under the State plan. Such action would reduce the individual below the level determined by the State as necessary for his maintenance.

[1965] *U.S.Code Cong. & Ad.News*, pp. 1943, 2019 (reprinting *S.Rep.No.* 404, 89th Cong., 1st Sess. (1965)).

In 1967, Congress, concerned about rising federal costs, amended the 1965 provisions by imposing the four–thirds limit. The defendants perceive in the 1967 amendments a change in Congressional intent, a willingness to create some inequity in order to hold down costs. The legislative history, however, does not bear this out.

Congressional consideration of the four–thirds rule was minimal. The amendment was but one small part of a Social Security bill containing wide–ranging revisions in several programs. The bill itself was pushed through both houses quickly, and legislators deplored the inadequate opportunity for study and debate.[15] Moreover, giv-

---

15. · *See* 113 *Cong.Rec.* 23129 (1967) (remarks of Rep. Mathias) ("The House has had less than two weeks to consider the committee's propos-

als, and in this short time has not been able to make a full assessment of their impact nationally or in individual cities and states."); *id.* at

en the clear intent in 1965 to treat the medically needy and categorically needy equally, one would expect some affirmative indications of the supposed Congressional change of heart. In fact, the record is eloquently silent.[16]

On the other hand, there are affirmative indications that Congress was not even aware of the disparate treatment which the four–thirds rule was likely to create. First, the conditions which led Congress to restrain federal expenditures for the medically needy in 1967 were entirely different from those now prevailing in Massachusetts. Congressional debate focused on the medically needy standards then in effect in New York, which made 45 percent of the entire state population eligible for Medicaid.[17] *See, e. g.*, 113 *Cong.Rec.* 22783 (1967) (remarks of Rep. Bingham); *id.* at 23104, 23108–09, 23087, 23093, 23098–99 (1967) (remarks of Reps. Bingham, Reid, Kupferman, Halpern, and Ryan); *id.* at 33168, 33171–72 (1967) (remarks of Sens. Javits and Robert Kennedy). The four–thirds rule was a reaction against state eligibility standards in the middle income range. See *id.* at 23099 (remarks of Rep. Ryan) ("The controversial point here is, of course, that some persons are included in the New York plan who are not related to traditional concepts of welfare cases.")

By tightening the reins on the overly generous spending of some states, Congress sought to prevent the medically needy program from becoming a national health insurance program for the middle class. *See* H.R.Rep.No.544, 90th Cong., 1st Sess. 118 (1967) ("Your committee neither expected or intended that such care would supplant health insurance presently carried or presently provided under collective bargaining agreements for individuals in or close to an average income range.") Hence, Congressional attention was directed toward the eligibility of the middle class for medically needy funds, a topic far afield from the plight of lower income Social Security recipients such as the plaintiffs here.

Second, the discrimination at issue here resulted from an eleventh–hour revision of the 1967 amendments, designed to attack a particular anomaly in the categorically needy provisions. The original versions of the bill all contemplated a single spending limit applicable to both the categorically and the medically needy.[18] But testimony before the Senate Finance Committee revealed that the House version of the bill would deprive some of the categorically needy of any Medicaid benefits. *See Social Security Amendments of 1967: Hearings Before the Senate Finance Committee*, 90th Cong., 1st Sess. 280 (1967). The problem was that the House version set a maximum income level, for both the categorically and medically needy, of four thirds the amount actually paid out by the states under

36783–84 (1967) (complaint of Sen. Robert Kennedy that there had been little time to consider Conference bill).

**16.** The evidence of intent relied on by defendants is either out of context or totally inapposite. For example, the federal defendant cites the testimony of Wilbur J. Cohen, Undersecretary of HEW, before the Senate Finance Committee. Undersecretary Cohen did point out that the four–thirds rule would in some states force a spend–down below the cash assistance level. *See Social Security Amendments of 1967: Hearings Before the Senate Finance Committee*, 90th Cong., 1st Sess. 280 (1967). But he was not testifying about the medically needy–categorically needy discrepancy. The Undersecretary's complaint was that the four–thirds rule would, due to the vagaries of state AFDC programs, exclude some of the categorically needy from Medicaid coverage. *See id.*

Similarly, defendants quote Senator Long's remark that the categorically needy have "first call on Federal funds." 113 *Cong.Rec.* 32594 (1967). But the Senator's observation related to a proposed reduction in the rate of federal reimbursement, a provision which the Conference Committee later eliminated from the bill.

**17.** *See* R. Stevens and R. Stevens, Welfare Medicine in America 92 (1974).

**18.** The Administration version called for a limit of 150 percent of the state's highest categorical income standard. *See* 113 *Cong.Rec.* 3899 (1967). The bill reported by the House contained a limit of four–thirds the AFDC standard. *See id.* at 21267, 23132. The Senate preferred a limit of 150 percent of the Old Age Assistance Standard. See *id.* at 32450, 33637.

AFDC. Since some states paid out less than 75 percent of the cash assistance level, the inevitable result was that some persons eligible for cash assistance would be ineligible for Medicaid.[19]

Confronted with this difficult problem, the Conference Committee adopted a simple solution. It exempted the categorically needy from the four–thirds limit. *See* [1967] *U.S.Code Cong. & Ad.News*, pp. 3179, 3209 (reprinting *Conf.Comm.Rep.No.* 1030, 90th Cong., 1st Sess. (1967)). As a result, all·of the categorically needy would be entitled to Medicaid, regardless of the individual state's AFDC payment standards. The House enacted the Conference version two days after it was reported. *See* 113 *Cong. Rec.* 35918, 36393 (1967). Two days after the House action, the Senate followed suit. *See id.* at 36924.

In short, the 1967 amendments provided, throughout their passage in the House and Senate, for equal treatment of the categorically and medically needy. It was not until the bill reached the Conference Committee that the changes occurred that eventually triggered this law suit. And of great significance in fathoming Congressional intent is the fact that this eleventh hour change did not grow out of any reconsideration of the relative need of the categorically and medically needy. It would be an exercise of fiction, not statutory construction, to charge Congress with having even discovered, let alone approved, the harmful consequences now apparent, given the short time for debate following the Conference Committee report.

Third, members of Congress who registered concern as to other provisions thought to discriminate against the medically needy did not oppose the four–thirds rule and its exemption for the categorically needy. The version of the Medicaid amendments favored by the Senate Finance Committee called for a reduction in the rate of federal reimbursement of medically needy programs. Senator Javits objected to the bill on the ground that it discriminated against the medically needy:

> The essence of our argument is that there is discrimination. The State is induced not to extend medical assistance because they are not drawing cash relief.... Senator Long wants to encourage people to go on cash relief. *Do not discriminate against them; lower your income eligibility limit, if you want; but treat everybody who falls below the ceiling in the same manner. That is the essence of our argument.*

113 *Cong.Rec.* 33171 (1967) (emphasis supplied).

Senator Javits' position ultimately carried the day. The final version of the amendments eliminated the reduction is reimbursement rate. Yet when the philosophically indistinguishable four–thirds rule came up for debate, no Congressional concern was expressed. It is significant that even Senator Javits, who had been an outspoken advocate, neither objected to the rule nor voiced any change of heart on the issue of parity for the medically needy. The only rational explanation as to why this legislative disparity exists is that the Congress, in its eleventh–hour consideration of the issue, did not recognize the full implications of the four–thirds rule. If Congress had foreseen the anomaly complained of here, surely the record would reflect some discussion paralleling the earlier debates over the proposed reduction in reimbursement rate.

Fourth, when Congress intended to alter statutory "comparability" requirements, it clearly expressed that intent. Under 42 U.S.C. § 1396a(a)(10)(c), medically needy in-

---

**19.** Undersecretary of HEW Wilbur J. Cohen provided the following example:

> [I]n Indiana, a family of four is eligible to receive assistance if their income is less than $271.40 a month, yet the highest amount that can be paid in assistance is $103. The House bill would mean that for the purpose of Federal matching, the family could receive cash assistance if their monthly income is up to $271.40, but medical assistance only if their income is below $137, about half of the eligibility level for cash payments.
> *Social Security Amendments of 1967: Hearings Before the Senate Finance Committee*, 90th Cong., 1st Sess. 280 (1967).

come standards must be "comparable" to categorically needy standards, and medical services provided to each group within the medically needy class must be "equal in amount, duration, and scope" to services provided the other groups.

In 1967, Congress decided to modify the latter "comparability" requirement in an effort to coordinate Medicaid with the Medicare program. This change appeared as section 223(a) of the 1967 amendments under the heading "Modification of Comparability Provisions." *See* Pub.L.No. 90–248, § 223(a), *reprinted in* [1967] *U.S.Code Cong. & Ad.News* at 1024. But there was no mention under that same heading of any change in the first "comparability" requirement, even though the same amendments contained the four–thirds rule. Had Congress realized that the four–thirds rule would create a substantial disparity between medically needy and categorically needy income standards, it most likely would have denominated the rule a "modification of comparability provisions" as well.

Fathoming Congressional intent can be a challenging exercise. Fictionalizing such intent is much easier. This court chooses to resist the multiple temptations inherent in the latter course. Here, the legislative history demonstrates that Congress never considered, let alone intended, the eventual effects of the four–thirds rule. It paints the picture of a Congress, anxious to remedy one form of discrimination in a complex legislative scheme, inadvertently creating another kind of discrimination by making a last–minute revision. That is not a criticism. It is simply an emphathetic statement of fact.

Congress did not rationalize the disparate treatment suffered by the plaintiffs here as being an inevitable, but legitimate, result of resource rationing and allocation. To the contrary, the Congress did not even foresee the disparity demonstrated by the circumstances of this case. The plight of the plaintiffs here is the result of a legislative accident. Under such circumstances, invalidation does not amount to a second–guessing of Congressional policymaking. *See Delaware Tribal Business Commission v. Weeks*, 430 U.S. 73, 97–98, 97 S.Ct. 911, 925–926, 51 L.Ed.2d 173 (1976) (Stevens, J., dissenting).

Defendants, however, assert a second purpose behind the statutory scheme, namely, to assure that the medically needy program would not supplant Medicare or private health insurance. The legislative history, however, contains no evidence that Congress viewed the four–thirds rule as a means of coordinating Medicare and Medicaid coverage. Defendants point to language apparently to the contrary,[20] but these quotes in fact refer to certain "buy–in" provisions entirely unrelated to the four–thirds rule.

Congress did hope that the rule would prevent duplication of private health insurance. But the targets of Congressional concern clearly were middle–income families and individuals, not aged and disabled Social Security recipients. *See H.Rep.No.544,* 90th Cong., 1st Sess. 118 (1967). Indeed, Congress had before it evidence as to the inadequacy of private insurance available to the aged. *See Medical Care for the Aged: Hearings Before the House Ways and Means Committee*, 89th Cong., 1st Sess. 40–44 (1965). The expressed purpose to prevent duplication of middle–income families' private health insurance, however, cannot support a rule which cuts so deeply into the basic needs of some of society's poorest individuals. A limit of four thirds the AFDC level bears no rational relation to the earning level of middle income people.

### IV. *Conclusion*

Finding no rational basis for the distinction drawn between Social Security and Supplemental Security Income recipients, this court holds the Massachusetts Medicaid program unconstitutional insofar as it

**20.** "Your committee is also concerned that the operation of some State plans may greatly reduce the incentives for persons aged 65 or over to participate in the supplementary medical insurance program of Title XVIII of the Social Security Act, which was also established by the Social Security Amendments of 1965." *H.Rep.No.*544, 90th Cong., 1st Sess. 118 (1967).

**1138**

forces Social Security recipients to spend down below Supplemental Security Income levels before receiving medical benefits. Plaintiffs' motion for partial summary judgment is allowed, and defendants' motion for partial summary judgment is denied.