## ALBERT LÉVITT *vs.* ATTORNEY-GENERAL OF THE STATE OF CONNECTICUT.

First Judicial District, Hartford, May Term, 1930

WHEELER, C. J., MALTBIE, HAINES, HINMAN AND BANKS, Js.

Argued May 7th—decided July 9th, 1930.

*Ernest L. Averill,* Deputy Attorney-General, with whom, on the brief, was *Benjamin W. Alling,* Attorney-General, for the appellant (defendant).

*Albert Lévitt, pro se,* for the appellee (plaintiff).

WHEELER, C. J.   The plaintiff presented on October 22d, 1929, a petition in writing to the Attorney-General under § 3614 of the General Statutes, signed by over one hundred electors of the State requesting him to file a complaint to have the commissioners of the Public Utilities Commission removed from office for "material neglect of duty." The Attorney-General declined to bring such a complaint. Thereafter, on January 23d, 1930, the plaintiff brought his application to the Superior Court for a writ of mandamus requiring the Attorney-General to file a complaint for the removal from office of these commissioners for "material neglect of duty." To this application the defendant Attorney-General made return admitting all of the allegations of the application and further alleging that he refused to act upon the petition for the reasons assigned in his reply to plaintiff's petition made a part thereof and marked Exhibit A.

The plaintiff made an oral motion to strike out Exhibit A.   No ruling was made on the motion.   At the court's suggestion the defendant said that he was willing to have Exhibit A regarded as a brief in support of the return, so that the court found that Exhibit A is not technically a part of the record.   The court

should have required the plaintiff to put his motion in writing and ordered the same applicable to the whole of the paragraph containing Exhibit A and then granted it. Exhibit A had no place in the pleadings and cannot be regarded by this court as a part of them. Irregularities in pleadings such as this complicate a record and are never in the end time-saving.

The trial court found the issues for the applicant, held the allegations of the application sufficient and adjudged that a peremptory writ of mandamus should issue. The fundamental question upon the appeal is whether the court erred in issuing the peremptory mandamus, and the decision finally must rest upon the answer to the question, do the allegations of the petition require the issuance of the writ?

The statute upon which the plaintiff based his petition and now bases his application is § 3614 of the General Statutes. Under it "material neglect of duty" by a commissioner shall constitute causes for removal. The material neglect upon which the plaintiff relies is in the violation by the commissioners of the provisions of § 3710 of the General Statutes. Under this section the duty is cast upon the directors of every railroad in the State to "remove or apply for the removal of at least one grade-crossing each year for every fifty miles of road operated by it in this State, which crossings so to be removed shall be those which in the opinion of said directors are among the most dangerous upon the lines operated by it." In the fulfillment of this statutory duty the railroads must remove at least one grade-crossing each year for every fifty miles of road which in their opinion are the most dangerous upon the lines operated by it. If the directors fail so to do the commission shall, "if in its opinion the financial condition of the company shall warrant, order such crossing or crossings removed as in its opinion said

directors should have applied for the removal of under the above provisions." Two conditions thus attach to the action of the commission. They must designate the crossing or crossings to be removed which in their opinion are most dangerous upon the lines operated by the railroad, and their order must be conditioned upon their findings that the financial condition of the railroad shall warrant, that is justify, such order. The court will not substitute its discretion for that of the commission as to either condition, unless it finds that the commission has acted illegally, or arbitrarily, or in abuse of its discretion, that is unreasonably. The discretion of the commission is not an unregulated one. It is subject to judicial review.

The case before us is not a review of the exercise of discretion by the commission but an application seeking the institution of legal proceedings by the Attorney-General for the failure of the commissioners to comply with these statutory requirements when the railroads have not removed a single grade-crossing in the five years prior to the filing of plaintiff's petition with the Attorney-General. The case is one for a violation by the commission of its statutory duty to order the removal of these grade-crossings during this period in which it is alleged and contended that the financial condition of the railroad would have warranted their removal by it.

Section 3614 further provides that "such removal shall be made only after judgment of the Superior Court rendered upon written complaint of the Attorney-General. The Attorney-General may file such complaint in his discretion, and shall file such complaint if so directed by the Governor, or if so requested in writing by one hundred electors of this State." The Attorney-General contends that he is not required under the provision we have quoted to act peremptorily

upon the filing of the petition by one hundred electors but may investigate the facts alleged and determine whether probable cause exists for removal justifying the filing of a complaint by him and that if he determines that no probable cause exists he is not required to act.

The petition filed with the Attorney-General under this section must contain at least one of the statutory grounds for removal—"misconduct, material neglect of duty, incompetence in the conduct of his office or active participation in political management or campaigns." And it must contain allegations which tend to show facts evidencing this ground, otherwise there would be no facts supporting the general ground and nothing to indicate that the commission had acted illegally or unreasonably, that is with abuse of its discretion.

The ground of the petition before us—a continued violation for five years of a statutory duty—would constitute a "material neglect of duty." The petition need not be in the form of a legal complaint. It must state facts, not manifestly untrue, which will put the Attorney-General upon notice as to the nature and character of the "material neglect of duty" charged and which will tend to make out a prima facie case of such neglect. Though inartificially stated the petition will be sufficient if it does that. The language of this statute is indeed peremptory but we must look "to the essential purposes to be served." The purpose was to protect the public interest against such misconduct, material neglect of duty, incompetence in office and the commission of what the General Assembly esteemed a harmful act to the large public interests within the regulation and keeping of the commission. To secure a prompt, certain and effective remedy against its failure in the performance of its public duties the General Assembly provided a legal machinery for their

removal through the agency of the Attorney-General, the law adviser and officer of the State, by giving him the power of his discretion to file in the Superior Court a written complaint for such breach of duty, and by imposing upon him the duty of filing such complaint when directed by the Governor, or when "requested in writing by one hundred electors of this State." The legislative intent in providing these three remedies was to make sure that the duty it had imposed upon the railroad and the Public Utilities Commission should be carried out, but without subjecting the railroad to the financial burden of this duty when its financial condition would not warrant it.

The statute did not give the Attorney-General the discretion to file a complaint for the removal of the commissioners except for one of the specified causes. It did not give the one hundred electors upon their request the power to require him to file a written complaint except for one of the specified causes. Manifestly the General Assembly contemplated at least some general specification of facts tending to show such "material neglect of duty." Until such a petition was presented to him the Attorney-General might exercise his discretion and refuse to file the complaint since up to that point there would be nothing tangible before him to indicate that there had been such a neglect. So interpreting this statute no public wrong will be done the commissioners. Interpreting it as a peremptory mandate upon the Attorney-General to file this complaint upon request might compel these public officers to defend themselves against a fruitless charge and to suffer the ignominy of having the charge bruited about without the opportunity of showing how baseless it was. We do not think the General Assembly intended such a wrong. The interpretation we accord the statute will protect these public officials from this grievous

wrong and at the same time accord to the public the full opportunity of having their interests properly protected against "material neglect of duty" of these high officials. When the written request of one hundred electors of this State is presented to the Attorney-General and it does specify one of these statutory grounds for the removal of the commissioners and also specifies facts, not manifestly untrue, which tend to support this charge, however inartificially it may be stated, the duty of the Attorney-General is a plain one. He must obey the mandate of the statute and he must bring the complaint and since it is a public action and he charged with the statutory duty of conducting such actions he must, to the best of his ability, fulfil this public duty, as Attorney-General, and his duty as a lawyer to protect the interest of his client, the people of the State.

We turn to the petition to ascertain whether the plaintiff has alleged facts which tend to support his charge that these commissioners have been guilty of the "material neglect of duty" which under § 3614 shall constitute cause for removal. The petition states with unmistakable clearness the request of the one hundred and over electors, in accordance with § 3614 of the General Statutes, to file a complaint to cause the removal of the commissioners from their office for "material neglect of duty" consisting of a violation of the provisions of § 3710 of the General Statutes. The facts as to this the petition then recites as follows: The Grade-Crossing Act places a duty upon the railroads which operate in this State to eliminate at least one grade-crossing every year for every fifty miles of railroad tracks in this State. As there are nine hundred and forty-four miles of railroad tracks in the State at least eighteen grade-crossings should be removed by the railroads every year, but they have not removed a

single grade-crossing under the provisions of § 3710 in the last five years. This Act also places a duty upon the Public Utilities Commission to order the removal of the grade-crossings which the railroads fail to remove at their expense, if in the opinion of the commission the financial condition of the railroads will warrant such removal. So far the allegations exactly conform with the provisions of § 3710. In order to show that the financial condition of the railroads will warrant such removal and so authorize the commissioners to order the removal of, or to remove, these grade-crossings the plaintiff further alleges: The average cost of removing a grade-crossing is $150,000, hence the removal of eighteen would cost the railroads $2,700,000. The Public Utilities Commission itself reports that the net earnings, clear profits, of the railroads in Connecticut since 1924 is, in 1925 $8,636,367.76, in 1926 $8,737,280.55, in 1927 $9,102,132.36 and in 1928 $17,-607,889.28, or a total for these four years of $42,283,-699.95.

The plaintiff further alleges: Had the railroads and the Public Utilities Commission obeyed the law and removed these eighteen grade-crossings each of these four years there would have remained a balance of net profit to the railroads in 1925 of over four million dollars, in 1926 of over six million dollars, in 1927 of over seven million dollars and in 1928 of nearly fifteen million dollars, hence the financial condition of the railroads did warrant the enforcement of this Act. The Public Utilities Commission failed to enforce and obey this Act and have been guilty of "material neglect of duty." The petition concludes: "We request you to take the legal steps necessary to remove the Commissioners of the Public Utilities Commission from office." These facts show that during the period covered by the petition the net profits of the railroads

were over forty-two millions of dollars, while the cost of removal of the eighteen grade-crossings a year for this period would have amounted to approximately eleven million of dollars. These allegations assuredly make out a prima facie case of the financial condition of the railroads during these years which would warrant the commission ordering the removal each year of the eighteen crossings a year.

Upon the facts alleged, by themselves, a reasonable conclusion could not be reached that the financial condition of the railroads as described would not warrant the commissioners in ordering the railroad to remove grade-crossings as required by statute. Upon their face they must be held to make out a continuing violation of the duty devolving upon the commission under § 3710 during these years and as a consequence to constitute a "material neglect of duty" under § 3614.

The petition did set forth sufficient facts to warrant upon its face the relief requested; in this respect it went further than the request by the one hundred electors is required to go under § 3614.

The defendant asks us to take judicial notice of many allegations of facts which he asserts are relevant to the question of whether the commission exercised a reasonable discretion in failing to require the removal of the grade-crossings in these four years. We cannot take judicial notice of most of these claimed facts; their relevancy or materiality to the years in question, or to the financial condition of the road as affecting the allegation concerning the forty-two million dollars of net profits are not before us for determination. It is true that we can in a general way take judicial notice of the condition of our chief railroad at the termination of Federal control and of the protracted struggle made to keep it from a receivership and of the debt we owe to the integrity, skill, constructive vision and patient

and indomitable courage of its management, as a result of which it was able to emerge from its period of depression and discouragement and resume its payment of dividends. We do not see how we can take judicial notice of the fact that it has been putting its surplus back into its property in order to build it up, for example, for the purpose of according reasonable rates of transportation to New England industries, or paying out of its profits dividends to its stockholders who had been compelled for a number of years to go without dividends. Nor do we see how these considerations, worthy as their purposes are, if admissible in evidence and established, would be conclusive of the question as to whether the financial condition of the railroad is such as to warrant an order for the elimination of grade-crossings as required by legislative mandate.

The Attorney-General asserts that under § 3614 he has a discretion to investigate the claim alleged in the petition and determine whether probable cause for removal exists justifying the filing of a complaint by him. The General Assembly did give the Attorney-General the right in the first instance to exercise his discretion in himself bringing a complaint against the commission for "material neglect of duty." It also gave the Governor power to direct the Attorney-General to file a complaint and finally it imposed upon him the duty of filing a complaint "when so requested in writing by one hundred electors of the State." In neither of these last two cases is he given the discretion of determining whether there is probable cause for removal. On the contrary, the language is mandatory, but under our construction the Attorney-General has the discretion of determining whether the petition of the one hundred electors upon its face alleges as its ground one of those in § 3614, and also alleges facts, not manifestly

untrue, which tend to support it. Prejudgment by the Attorney-General that there has been, or has not been, a material neglect of duty by the commissioners would be the determination by him of the duty cast upon the Superior Court by the legislature and to be exercised under the usual machinery of justice. If the discretion claimed by the Attorney-General were accorded him the purpose of the General Assembly might be frustrated and the remedial processes of the statute might be practically nullified. Such discretion as he has by our construction must be reasonably exercised and is always subject to judicial review.

For the reasons expressed we cannot hold, as the Attorney-General urges, that his determination that no reasonable cause exists terminates his duty toward the one hundred filing their petition. To the point that mandamus will not lie since the plaintiff has adequate remedy for enforcement of any duties existing under § 3710 against railroad companies or the Public Utilities Commission for any material breach of duty, the sufficient answer is that this action is not against the companies or the commission but against the Attorney-General to require his performance of the duty placed upon him by § 3614. For this there is no adequate remedy anywhere else to compel him to perform his statutory duty that we are aware of, certainly none which approaches the standard set in *State ex rel. Foote* v. *Bartholomew,* 103 Conn. 607, 618, 132 Atl. 30. "Any other relief," we there say, "the existence of which will preclude the resort to the remedy by mandamus, must not only be adequate, but it must be specific, that is, it must be adapted to secure the desired result effectively, conveniently, completely and directly upon the very subject-matter involved."

Finally the Attorney-General urges that the delegation to the judicial branch of the government of the

power of removal of an administrative officer is in violation of the Fourteenth Amendment to the Constitution of the United States in that it deprives the members of the Public Utilities Commission of their office without due process. The Fourteenth Amendment has, so far as we can find, never before been sought as a refuge by one official to prevent his bringing a statutory action to remove other officials from office when the violation of the due process clause of the Amendment charged by him is against the other officials and not against himself. One administrative officer cannot attack the constitutionality of a statute because it may violate the constitutional rights of other administrative officers in order to avoid his own performance of a mandatory duty imposed upon him by that statute. On a writ of mandamus against the treasurer of a town to compel him to collect the taxes he urged that the statute authorizing the taxes was unconstitutional. The court held: "It does not, however, lie with the respondent, as a ministerial officer, to make this objection. He is not authorized, or required to adjudicate the law. On a summary hearing on a petition for a mandamus, this court will not determine the question of the constitutionality of the law, involving the rights of third persons, but will leave that question to be settled, when properly presented by parties to an action. . . . A public officer entrusted with the collection and disbursement of revenue, in any of the departments of government, has no right to refuse to perform his ministerial duties, prescribed by law, because he may apprehend that others may be injuriously affected by it, or that the law may, possibly, be unconstitutional." *Smyth* v. *Titcomb*, 31 Me. 272, 285, 286.

Section 3614 does not delegate to the Superior Court the power to remove these officials from office; it finds

the facts constituting the "material neglect of duty" and the legislature prescribes that it shall then render judgment to that effect and that the office shall thereupon become vacant. The statute says: "If after hearing the court shall find cause for removal it shall render judgment to that effect, and thereupon the office of such commission shall become vacant." The statute does not delegate the power of removal to the court and therefore the premise for the defendant's claim that this statute violates the due process clause vanishes. Due process of law is the law of the land and "is found in any kind of procedure, 'which is suitable and proper to the nature of the case, and sanctioned by the established customs and usages of the courts.' " *O'Brien's Petition,* 79 Conn. 46, 55, 63 Atl. 777; *Ex parte Wall,* 107 U. S. 265, 289.

The procedure authorized by § 3614 satisfies every requirement of the due process clause: "Upon the filing of such complaint a rule to show cause shall issue to the accused, who may make any proper answer within such time as the court may limit, and shall have the right to be heard in his own defense and by witnesses and counsel. The procedure upon such complaint shall be similar to that in civil actions, but such complaint shall be privileged in order of trial, and shall be heard as soon as practicable." And then follows the clause quoted above.

The further constitutional ground is advanced that, "under the Constitution of Connecticut an administrative officer appointed by the Governor with the advice and consent of the General Assembly can only be removed by the Chief Executive of the State for reasonable cause and after hearing had and the power of the judicial branch is confined to reviewing the order of removal of the Chief Executive." This claim has

even less merit than the due process claim and may be disposed of summarily.

The Public Utilities Commission was created by the General Assembly. The power which creates has the power to remove, in the absence of constitutional or statutory provision to the contrary, of which there was none in this State at the creation of this commission. *State ex rel. Engelke* v. *Kilmartin,* 86 Conn. 56, 84 Atl. 100; *State ex rel. Kositzky* v. *Prater,* 48 N. D. 1240, 189 N. W. 334; Mechem on Public Officers (Ed. 1890) § 445. The General Assembly thus had the power of removal. *State ex rel. Engelke* v. *Kilmartin,* 86 Conn. 56, 62, 84 Atl. 100; *Fairfield County Bar* v. *Taylor,* 60 Conn. 11, 12, 22 Atl. 441; *State ex rel. Reiley* v. *Chatfield,* 71 Conn. 104, 112, 40 Atl. 922. Having the exclusive power of removal, the General Assembly may prescribe the method and manner of removal which it has done in § 3614. *State ex rel. Engelke* v. *Kilmartin,* and *State ex rel. Kositzky* v. *Prater, supra.* It is true it has in many instances given this power to the Governor. It had the right to itself retain its power in this particular instance. This it did by the method it adopted providing a finding of the cause by the Superior Court and authorizing a judgment to follow such finding and thereupon, automatically, providing that the office should become vacant.

This concludes our discussion of the questions which have been presented to us by brief and in argument.

There is no error.

In this opinion the other judges concurred.