BARNABY HORTON ET AL. *v.* THOMAS J. MESKILL ET AL.

SUPERIOR COURT          HARTFORD COUNTY          FILE No. 185283

PETER D. GRACE ET AL. *v.* THOMAS J. MESKILL ET AL.

SUPERIOR COURT          HARTFORD COUNTY          FILE No. 186436

Memorandum filed December 26, 1974

*Regnier, Moller & Taylor,* of Hartford, for the plaintiffs in the first case and the named plaintiff in the second.

*Robert K. Killian,* attorney general, and *F. Michael Ahern* and *David J. Della-Bitta,* assistant attorneys general, for the named defendant et al. in the first case and the defendants in the second.

*Day, Berry & Howard,* of Hartford, for the defendant William S. Grace et al. in the first case.

RUBINOW, J. In these actions, the plaintiffs seek a declaratory judgment determining whether the system of financing public schools in this state, insofar as it applies to pupils in public schools in Canton, violates the United States constitution or the Connecticut constitution, or both. Although the plaintiffs also claim equitable relief, that relief is clearly only ancillary to the plaintiffs' principal claim. See *Wenzel* v. *Danbury,* 152 Conn. 675, 678.

I

The principal claim is that the funds necessary to operate elementary and secondary schools in Connecticut are raised principally by local property taxes; that the local property taxes thus raised vary on a broad scale from town to town; that that variation results in broad variations from town to town in the amount of money available for operating the local public schools; that these variations in turn produce broad variations from town to town in both the breadth and quality of instruction available to

pupils; and that, therefore, the present system for financing public school education discriminates against the pupils in Canton because the breadth and quality of public school education they receive is inferior to that which pupils receive in comparable towns with a larger base of taxable property.

The claims made by the plaintiffs in these cases are similar to the claims that have been made and ruled upon, or are now pending, in cases in thirty-six other states. See 2 Report of Governor's Commission on Tax Reform 47 (Dec. 1972). Because education-financing systems vary from state to state, and because the provisions of state constitutions vary from state to state, decisions in other states raising the issue under a state constitution are of little value as precedents. The leading case raising the issue under the federal constitution, *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, decided that the Texas system of financing public education did not violate the equal protection clause of the United States constitution. The reasons cited by the majority opinion for that holding are, briefly stated, (1) that the "strict judicial scrutiny" test did not apply because (a) there was no showing that a definable category of "poor" persons was discriminated against and (b) the Texas system did not impinge upon a right that was afforded explicit or implicit protection under the United States constitution, since education was not such a right; and (2) that the "rational relationship to a legitimate state purpose" test was satisfied because the Texas system assured a basic education for every child, while allowing local control of local schools through local taxation.

Although there are significant differences between the Texas system and the Connecticut system, those differences do not, in the opinion of this court, make inapplicable to the Connecticut system the reasons

why the Texas system was held not to violate the United States constitution. *Rodriguez* is, therefore, controlling authority that the Connecticut system does not violate the equal protection clause of the United States constitution. Furthermore, *Rodriguez* is also persuasive authority as to the proper construction of the equal protection clause, article first, § 20, of the Connecticut constitution. On the other hand, since *Rodriguez* concerned only the equal protection clause of the United States constitution, that decision is not authority in construing clauses of the Connecticut constitution other than its equal protection clause.

## II

In Connecticut, the duty of educating children is a duty of the state. Even before the constitution of 1965, our Supreme Court had held that "under our law the furnishing of education for the general public is a state function and duty." *State ex rel. Board of Education* v. *D'Aulisa,* 133 Conn. 414, 418. "It is a duty not imposed by constitutional provision, but has always been assumed by the State; not only because the education of youth is a matter of great public utility, but also and chiefly because it is one of great public necessity for the protection and welfare of the State itself." *Bissell* v. *Davison,* 65 Conn. 183, 191. "It has long been held in Connecticut that town and city boards of education are subject to local control only as to budgetary matters. . . . In all other respects, the local boards 'serve as agents of the state in their communities.'" *Murphy* v. *Berlin Board of Education,* 167 Conn. 368, 372.

In 1965, this state function and duty to furnish public education was formally recognized and incorporated into the Connecticut constitution in article eighth, § 1, which reads as follows: "There shall always be free public elementary and secondary

schools in the state. The general assembly shall implement this principle by appropriate legislation." This constitutional provision has two important consequences for purposes of the present litigation. First, the state is now under a constitutional duty to furnish free public elementary and secondary education. See *Murphy* v. *Berlin Board of Education,* supra. Second, the General Assembly is under a constitutional duty to enact legislation that will be "appropriate" to carry out the state's constitutional duty to provide free public elementary and secondary schools. Hence, although the duty of educating children has been delegated by statute to municipalities, both the common law of this state and the Connecticut constitution provide that the duty of educating Connecticut children is upon the state, as a whole, and not upon its municipalities.

The mechanics by which the duty of operating and maintaining public schools has been delegated to the municipalities is to be found in statutes that antedate the constitution of 1965. The essential statutes are now General Statutes § 10-240, which provides that each town is a school district and that each town shall "maintain the control" of all public schools within its limits; § 10-241, which provides that each school district shall have the power to lay taxes, to build schoolhouses and to establish and maintain schools of different grades; and § 10-220, which provides that the boards of education shall maintain in their several towns good public elementary and secondary schools. Those statutes and their predecessors have long been part of the history of public schools in this state. "From the earliest period in the history of Connecticut the duty of providing for the education of children was regarded as a duty resting upon the state — a governmental duty. Both before and since the adoption of the constitution [of 1818], that duty was, and has been,

performed through the instrumentality of towns, societies and districts, as the legislature from time to time saw fit. In so far as these subdivisions of the territory of the state were used for the performance of this duty, they were the mere agents and instruments of the state, liable to be changed at its pleasure, and used by it from time to time solely because the object in view could in its opinion be more effectually and economically accomplished through such agencies than in any other way." *State ex rel. Walsh* v. *Hine,* 59 Conn. 50, 60.

The duty-delegating statutes just cited are, of course, but a small section of the statutory scheme concerning the financing and operating of elementary and secondary schools. Those statutes have been singled out because they set forth the basic provisions authorizing the levy of local property taxes to operate schools and authorizing boards of education to exercise authority over the operation of the schools. Nevertheless, as noted previously, the duty to educate is that of the state; delegating the duty does not discharge it.

### III

Under present statutory programs, the funds raised by local property taxes by each town are supplemented by both state and federal grants. The principal state grant is the so-called average daily membership grant (General Statutes § 10-262), which is $250 per pupil in average daily membership. Other programs provide, for example, for grants for exceptional and handicapped students (§§ 10-76a to 10-76g); school libraries (§ 10-267); school construction (§ 10-286); and student transportation. §§ 10-266j, 10-273a, 10-277. In addition, funds are available from the federal government in the form of special grants.

Despite the variety and number of state-aid-to-education grants, the local property tax is the principal source of funds for operating the public elementary and secondary schools. A state commission studying school finances issued a report containing the following estimate of the sources of school revenues in this state during the 1973-1974 school year: local taxes, 73.8 percent; state aid, 23.1 percent; federal aid, 3.1 percent. Interim Report of the Commission to Study School Finance and Equal Educational Opportunity, p. 10 (Feb. 1974). Because local property taxes are the principal source of revenue for schools, one significant way to measure the relative amount of money available for schools is to obtain the grand-list-per-pupil figure by dividing the grand list of the town by the number of pupils. The evidence in this case is that the range in the grand-list-per-pupil figure in this state varies from approximately $20,000 (Chaplin) to over $170,000 (Greenwich). Canton is at the lower end of the scale with approximately $38,000. The state average is $53,312.

In the light of these figures, it is not surprising that the school finance report should speak (p. 4) of "the manifest disparities in tax resources of Connecticut's school districts," or that the Governor's Tax Reform Commission Report should say (vol. 2, p. 53): "In short, many towns can tax far less and spend much more; and those less fortunate towns can never catch up in school expenditure because taxes are already as high as homeowners can tolerate. . . . This dual inequity—a family can pay more and get less for its children—is the fundamental issue of school finance." These generalizations find full support in a statistical analysis of the Connecticut school-financing system in a note in 81 Yale L.J. 1303 entitled "A Statistical Analysis of the School Finance Decisions: On Winning Battles and Losing Wars." In that note, which was described in

*San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 23, as an "exhaustive study of school districts in Connecticut," the authors found that "[a]ll measures of district wealth correlate quite highly with expenditures [per] pupil." 81 Yale L.J. 1303, 1328.

There can be no doubt, then, that in Connecticut the amount of money that is spent for the public school education of a child is determined to a large degree by the tax base in the municipality he lives in, and that there are great disparities among the 169 towns in the amount of tax base per pupil. A low tax base in a given municipality does not, of course, mean that that municipality has a low per capita wealth. The plaintiffs, in other words, are not complaining that, under the present system, the children of poor parents live in towns with a low tax base and that, therefore, the present system discriminates against the poor. The plaintiffs in these and similar cases are complaining about "the sheer irrationality of a system that allocates education on the basis of property values. . . . [Their] argument would be similar and no less tenable should the state make educational expenditures dependent on some other irrelevant factor, such as the number of telephone poles in the district." Note, 81 Yale L.J. 1303, 1307.

In other words, the complaint about the present system is that the amount of money presently available for educating public school pupils in Connecticut is determined significantly by the town's grand list, which is totally unrelated to either the needs or wants of those pupils. A school district with a low per-pupil grand list has to narrow the breadth of its curriculum and its extracurricular programs. Additionally, it may not have the personnel necessary to cultivate "grantsmanship" (see note, 81 Yale L.J. 1303, 1322 n.94); or to perceive, and provide

special instruction for, both handicapped and gifted children; or to furnish counseling to children in need of it; or to have a well-rounded vocational training program. Also, it may not be able to have a salary range adequate to attract the more competent and better-trained personnel. To the extent that lack of local property tax money imposes some or all of these deficiencies upon the pupils in one town to a substantially greater degree than upon the pupils in another town, the former pupils are being denied these educational advantages, not because they do not need them or want them, but because the present method of raising funds to provide for their education is not related to either their educational needs or their wants.

As previously noted, that present method is the result of legislation in which the state delegates to municipalities of disparate financial capability the state's duty of raising funds for operating public schools within those municipalities. That legislation gives no consideration to the financial capability of a municipality to raise funds sufficient to discharge another duty delegated to the municipality by the state, that of educating the children within the municipality. The evidence in this case is that, as a result of this duty-delegating to Canton without regard to Canton's financial capabilities, pupils in Canton receive an education that is in a substantial degree lower in both breadth and quality than that received by pupils in municipalities with a greater financial capability, even though there is no difference between the constitutional duty of the state to the children in Canton and the constitutional duty of the state to the children in other towns.

Under the present statutory system, the legislation ignores the disparities in the tax base of the municipalities and thereby ensures disparities in

public school education. The constitutional duty to educate the children of the state is a constitutional duty of the state; it is not the constitutional duty of the municipalities. If the state delegates that duty to the municipalities, the legislation that delegates that duty must, under article eighth, § 1, of the Connecticut constitution be "appropriate." The disparities in educational opportunity that are inherent in the present duty-delegating legislation make that legislation not "appropriate" legislation for discharging the state's constitutional duty, and that legislation therefore violates article eighth, § 1, of the Connecticut constitution.

The court is not unmindful of the testimony that there is no conclusive evidence that there is a correlation between education input (expenditures per pupil) and education output ("better educated" pupils). On the other hand, the evidence in this case is highly persuasive that, all other variables being constant, there is a high correlation between education input and education opportunity (the range and quality of educational services offered to pupils). In other words, disparities in expenditure per pupil tend to result in disparities in education opportunity.

Nor is the court unmindful of the testimony concerning the theory that there is a lessening marginal utility for each successive increment of education input. That theory does not mean, however, that the utility from any given increment, in terms of an increase in education opportunity, will not be commensurate with the expenditure necessary for that increment. There was direct evidence that an increase in per-pupil expenditures in Canton would raise the level of education opportunity there in significant and highly desirable respects.

## IV

There is an additional reason why the present statutory scheme does not comply with the Connecticut constitution. Under article first, § 20, of that constitution, "[n]o" person shall be denied the equal protection of the law." This provision and the equal protection clause of the federal constitution "have the same meaning and impose similar constitutional limitations." *Karp* v. *Zoning Board,* 156 Conn. 287, 295. Since *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, interpreted the federal equal protection clause with respect to the same issue as that involved in this case, *Rodriguez,* as previously noted in this memorandum, is persuasive authority concerning the meaning of article first, § 20, of the Connecticut constitution. In its opinion in *Rodriguez,* the Supreme Court of the United States said (p. 17): "We must decide, first, whether the Texas system of financing public education operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. If so, the judgment of the District Court [holding that the Texas system violated the equal protection clause of the United States constitution] should be affirmed."

Under article eighth, § 1, of the Connecticut constitution, there shall "always" be free public elementary and secondary schools in the state. Also, the General Assembly is commanded to "implement this principle by appropriate legislation." The opinion in *Rodriguez* makes it clear that if there had been a provision in the United States constitution saying that education is a fundamental right, the Supreme Court of the United States would have found that the Texas system violated the equal protection clause. Although article eighth, § 1, of the Connecticut constitution does not declare in haec verba that

education is a fundamental right, the mandatory language that the General Assembly shall "implement" the principle "by appropriate legislation" makes it the duty of the General Assembly to provide for free public education and creates a correlative right to that education. The repeated statements in our cases concerning the importance to the state of educating its children (see, e.g., *State ex rel. Walsh* v. *Hine,* 59 Conn. 50, 60) make inevitable the conclusion that the right thus created by article eighth, § 1, of the Connecticut constitution is a fundamental right.

Under the equal protection clause, an interference with the "fundamental right" to education requires "strict judicial scrutiny . . . [which] means that the State's system is not entitled to the usual presumption of validity, that the State rather than the complainants must carry a 'heavy burden of justification,' that the State must demonstrate that its educational system has been structured with 'precision,' and is 'tailored' narrowly to serve legitimate objectives and that it has selected the 'less drastic means' for effectuating its objectives." *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1. The Supreme Court of the United States found that the Texas system "and its counterpart in virtually every other State will not pass [the] muster" of "strict judicial scrutiny." Id., 17.

It has been argued that the Connecticut system may be justified on the ground that it serves the "legitimate objective" of local control. There is, however, no reason why local control needs to be diminished in any degree merely because some system other than the present system is adopted. Indeed, there was convincing evidence that other systems have been adopted without any loss of local control. Since that same objective may be achieved without the discrimination of the present system,

that objective may be achieved by "less drastic means" and is therefore no justification for interfering with the fundamental right to education.

The court holds that, under the reasoning and authority of *Rodriguez,* the Connecticut system violates article first, § 20, of the Connecticut constitution.

## V

The record discloses that there still remains for decision an issue raised in a challenge to the jurisdiction of the court. That challenge arose originally out of a motion to erase filed by state officials who are defendants in this case. The motion to erase raised issues of justiciability, sovereign immunity and standing. On January 21, 1974, the court (*Parskey, J.*) ruled against those defendants on the issue of justiciability, on the ground that "the defendants make no claim contesting the adverse relationship of the opposing parties; nor could they on the face of the record," and also on the issue of standing, on the ground that under General Statutes § 10-15, which requires that public schools be open to all children over five years of age, a plaintiff presently eligible for public schooling has standing to claim that the distribution of funds for public schools does not meet constitutional standards.

The issue of sovereign immunity was, however, not decided by the court, on the ground that, first, the question should have been raised by a demurrer and not by a motion to erase and, second, if it is assumed that sovereign immunity is no defense where a complaint charges officials with violation of a plaintiff's constitutional rights (*Weaver* v. *Ives,* 152 Conn. 586, 590), such a claim "concerns the viability of the plaintiffs' cause of action and therefore must await consideration at an appropriate time."

Accordingly, on the current state of the record, the claim of sovereign immunity has been raised but has not been decided. Since that claim, if valid, would prevent the entry of a judgment binding on the state officials, who are the primary defendants in the plaintiffs' suit, the court must make a definitive disposition of the issue raised by that claim.

As noted previously, the primary objective of the present actions is to obtain a declaratory judgment; the request for equitable relief is merely ancillary to that primary objective. That these actions are primarily actions for a declaratory judgment is significant to the question of sovereign immunity in two respects: First, "it has been held elsewhere that the doctrine [of sovereign immunity] was not meant to apply to actions which seek, as the plaintiff seeks here, nothing more than a declaration of legal rights. . . . Such a conclusion is consistent with the law of this state." *Textron, Inc.* v. *Wood,* 167 Conn. 334, 342. Second, where an action for a declaratory judgment concerns a matter "of considerable public importance" (*Larke* v. *Morrissey,* 155 Conn. 163, 169), as it does in this case, "the statute and rules [concerning declaratory judgments] should be accorded a liberal construction to carry out the [highly remedial] purposes underlying . . . [declaratory] judgments." *Sigal* v. *Wise,* 114 Conn. 297, 301. Under this principle, even if the doctrine of sovereign immunity might be a valid defense to declaratory judgment actions against state officials, the defense should not be available where it is of "considerable public importance" that there should be a judicial determination of the question that is the subject of the action for the declaratory judgment. If the rule were otherwise, the sovereign immunity defense could be used to foreclose judicial determinations even though such a determination was manifestly in the public interest.

Accordingly, the court rules that the defense of sovereign immunity filed on behalf of state officials is overruled.

## VI

In *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 58, the Supreme Court of the United States said: "The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them."

The court at this time retains jurisdiction of the action and will render no judgment other than a declaratory judgment that General Statutes §§ 10-240 and 10-241, insofar as they purport to delegate to Canton the duty of raising taxes to operate free public elementary and secondary schools and insofar as they purport to delegate to Canton the duty of operating and maintaining free public elementary and secondary schools, violate article first, § 20, and article eighth, § 1, of the Connecticut constitution. Counsel for the plaintiffs is to prepare a judgment file and submit it to counsel for the defendants for approval as to form. If counsel are unable to agree on the form of the judgment file, counsel for the plaintiffs is to notify the court and a hearing will be held on that matter.

## VII

The court thanks counsel for the exceptionally thorough and competent preparation and presentation of the evidence in the case and their outstanding briefs.