**George A. ATHANSON et al., Plaintiffs,**

v.

**Ella T. GRASSO, Governor of the State of Connecticut, et al., Defendants.**

**Civ. No. 15074.**

United States District Court, D. Connecticut.

March 30, 1976.

Alexander A. Goldfarb, Corp. Counsel, Richard M. Cosgrove, Deputy Corp. Counsel, Peter G. Boucher, Asst. Corp. Counsel, Hartford, Conn., for plaintiffs.

Carl Ajello, Atty. Gen., F. Michael Ahern, David J. Della-Bitta, Asst. Attys. Gen., Hartford, Conn., for defendants.

Before SMITH, Circuit Judge, and CLARIE and BLUMENFELD, District Judges.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge:

This action challenges Connecticut's method of financing public education.* The gravamen of the complaint is that differences in the amount of property available for taxation in the several school districts throughout the state result in a heavier burden on Hartford taxpayers for expenditures per pupil for education. The plaintiffs claim that the State's statutory method of paying an equal amount per pupil to assist each town in bearing its costs of education, when considered in light of this burden, denies them the equal protection of the laws, in violation of the fourteenth amendment.

In the complaint as originally filed, the plaintiffs were: (1) City of Hartford; (2) City of Hartford, represented by the City Council (both as official representatives of the city and as individuals); and (3) the "aggregate resident population of" Hartford, represented by (a) The City of Hartford, and (b) The City Council of Hartford.[1]

The amended complaint names the Mayor, the members of the City Council and the Treasurer, "in their respective capacities as officials of the City of Hartford," as plaintiffs.

The defendants have filed a motion to dismiss.[2] Although the Supreme Court held contrary to these plaintiffs' contention in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), a case challenging Texas' similar educational financing method, before we can consider whether *Rodriguez* requires dismissal of this case we must address the threshold question of the plaintiffs' standing to bring this suit.[3]

---

* The parties defendant have been automatically substituted pursuant to Rule 25(d)(1), Fed.R. Civ.P.

1. These plaintiffs have styled themselves as the City Council of Hartford, although their official title is actually the Court of Common Council. We will adopt the plaintiffs' term for the remainder of this opinion.

2. In an earlier ruling on a motion for a more definite statement we adverted to the issue of standing. Civil No. 15,074 (D.Conn. July 2, 1973). Now, in light of subsequent Supreme Court decisions, we consider the issue more exhaustively, with reference to the amended complaint.

3. The motion to dismiss is brought "on the ground that the allegations of the complaint are insufficient in law or fact to establish the jurisdiction of the Court." The parties have properly construed this to raise the issue of standing. It has been said "[j]urisdiction depends upon standing . . . ." *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 197, 76 S.Ct. 763, 767, 100 L.Ed. 1081, 1088 (1956). Standing was held essential to jurisdiction in *Coleman v. Miller*, 307 U.S. 433, 446, 59 S.Ct. 972, 978, 83 L.Ed. 1385, 1392 (1939). Mr. Justice Frankfurter's opinion in that case stated:

"We can only adjudicate an issue as to which there is a claimant before us who has a special, individualized stake in it. One who is merely the self-constituted spokesman of a constitutional point of view cannot ask us to pass on it."

307 U.S. at 467, 59 S.Ct. at 988, 83 L.Ed. at 1404. *Cf.*, the distinction made by Justice Powell, between the constitutional and prudential aspects of standing. *Warth v. Seldin*, 422 U.S. 490, 498–500, 95 S.CT. 2205, 2199, 45 L.Ed.2d 343, 354 (1975).

*Standing*

■ Standing is a "threshold question in every federal case," and, ". . . . the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute . . . ." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). The standing requirement is derived from article III, section 2, which limits federal judicial power to "cases" and "controversies." Among the essential elements of a "case" are that the litigant have "a personal stake in the outcome of the controversy" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962), and allege some "injury in fact" to himself, *Association of Data Processing Services Organizations, Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 187 (1970), as distinguished from injury to "the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205, 45 L.Ed.2d at 354.[4]

The description of the plaintiffs as "officials" in the amended complaint was apparently a reaction to two decisions in this circuit, *City of New York v. Richardson*, 473 F.2d 923 (2d Cir.), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973), and *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974). In those cases the Court of Appeals, relying upon *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015, 1020 (1933), and its reasoning that

"[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator"

held that "The City [New York] lacks standing to assert constitutional claims against the State . . . ."[5]

■ As those cases reveal, the plaintiffs were well advised to abandon their reliance in the original complaint upon their capacity to sue as representatives of the City or as the City Council. It is not that a city lacks capacity to sue, but only that it cannot sue its creator. That disability to sue its creator cannot be circumvented by substituting the city's governing body for the city. As a city is a creature of the state, so also is the city's governing council. *Williams*, 289 U.S. at 40, 53 S.Ct. at 432, 77 L.Ed. at 1020. Thus, the plaintiffs lack standing in the first two capacities in which they have brought this suit.

■ The plaintiffs are no more successful in the third capacity. As already indicated by *Warth v. Seldin*, the plaintiffs must allege injury other than one to "the legal rights or interests of [others]." 422 U.S. at 499, 95 S.Ct. at 2205, 45 L.Ed.2d at 355. Thus, they cannot sue on behalf of the "aggregate resident population of Hartford." Furthermore, those on behalf of whom they would bring this action would not themselves be able to maintain it in this court. The Chief Justice has recently discussed the fact that the injury required for standing must be particularized, in *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) and *Schlesinger v. Reservists Committee To Stop The War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). The importance of this concept was epitomized in the concurring opinion of Justice Powell in *United States v. Richardson*, 418 U.S.

---

4. The requirement that a plaintiff assert his own legal rights, and not solely those of third parties, is a general rule of "judicial self-governance." 422 U.S. at 500, 95 S.Ct. at 2206, 45 L.Ed.2d at 355.

5. *Aguayo*, 473 F.2d at 1101; *City of New York*, 473 F.2d at 929. The same rule exists in Connecticut. *See Waterford v. Conn. State*

*Bd. of Education*, 148 Conn. 238, 245, 169 A.2d 891, 895 (1961):

"Towns and local boards of education are creatures of the state, and though they may question the interpretation, they cannot challenge the legality, of legislation enacted by their creator."

at 195 n. 16, 94 S.Ct. at 2955, 41 L.Ed.2d at 698:

"All standing cases, even the most recent ones, include references to the need for particularized injury or similar language. None of them as yet has equated the interest of a taxpayer or citizen, suing in that status alone, with the particularized interest that standing doctrine has traditionally demanded. To take that step, it appears to me, would render the requirement of direct or immediate injury meaningless and would reduce the Court's consistent insistence on such an injury to mere talk."

We next consider the fourth and final capacity with which the plaintiffs clothe themselves in their effort to achieve standing. The plaintiffs contend that as "officials" they fit within the holding in *City of New York*, 473 F.2d at 933 that:

" . . . those plaintiffs who sued in their official capacities may assert constitutional claims against the state under the rule announced in *Board of Education v. Allen*, 392 U.S. 236, 241, n. 5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). This is so because of the conflict each of the officials must face between his sworn duty to uphold the Constitution of the United States and his responsibility for administering New York's allegedly unconstitutional Social Services Law."

*See also Aguayo*, 473 F.2d at 1100.

■ As a district court, although composed of three judges, we are required to follow the law of our own circuit insofar as it is pertinent. *Lewis v. Rockefeller*, 431 F.2d 368, 371 (2d Cir. 1970); *Thoms v. Smith*, 334 F.Supp. 1203 (D.Conn. 1971), *aff'd sub nom. Thoms v. Heffer-*

nan, 473 F.2d 478 (2d Cir. 1973), *vacated and remanded*, 418 U.S. 908, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974), *reaff'd*, No. 72–1013 (2d Cir. Nov. 18, 1974).

The standing of certain public officials in both *City of New York* and *Aguayo* was upheld on the authority of footnote 5 in *Allen*. Probably because standing had been conceded in *Allen*, the issue was disposed of there without discussion, and without reference to precedents other than a citation to *Baker v. Carr*.[6]

However, it would be a serious mistake to assume that *Allen* stands for the broad proposition that all public officials have standing to challenge the constitutionality of laws with which they do not agree. In "extrapolating broad general rules from particular holdings" caution must be exercised. *Kimbrough v. O'Neil*, 523 F.2d 1057, 1067 (7th Cir. 1975) (concurring opinion of Justice Stevens, then Cir. J.). Justice Jackson's reminder to counsel in *Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118, 123 (1944), is equally applicable to judges:

"It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading. The context of the language cited from the *Tennessee Coal* case should be sufficient to indicate that the quoted phrases were not intended as a limitation on the Act, and have no necessary application to other states of facts."

---

**6.** *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236, 241 n.5, 88 S.Ct. 1923, 1925, 20 L.Ed.2d 1060, 1064 (1968) reads:

"Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violat-

ing their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)."

*See also Communications Workers of America, AFL–CIO v. American Tel. & Tel. Co., Long Lines Dept.,* 513 F.2d 1024 (2d Cir.), *petition for cert. filed,* 43 U.S. L.W. 3684 (U.S. June 24, 1975) (No. 74–1601).

Heeding these admonitions, we note preliminarily that, in considering whether *Allen* ought to control the decision on standing in this case, the fact that standing was not put in issue there means only that it was not briefed or argued. The Court necessarily conducted its own examination of the issue, and concluded that the board members had standing to sue. Otherwise, counsel for the parties would be permitted to make significant choices having binding precedence.

The remainder of footnote 5 in *Allen* is not framed in the abstract, but fits within the legal system of the State of New York. There is a story behind these words. It is only in the whole context of the *Allen* case that Justice White's complete meaning is revealed. The conflict between "violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office . ." 392 U.S. at 241 n.5, 88 S.Ct. at 1925, 20 L.Ed.2d at 1064, may be misleading if applied to the case before us without further investigation. No detailed information was given about the structure from which the Court concluded that the board members had a "personal stake in the outcome." Perforce, we shall look more deeply into the record and examine both aspects of that ruling.

### A. *Removal from Office*

■ Lest whether these plaintiffs are likely to be removed from office be confused with what might cause a removal, we consider these elements separately.

There was support in *Allen* for the plaintiffs' contention that adherence to their oaths "would be likely to bring their expulsion from office . . . ." The Court in *Allen* had the benefit of Justice Staley's concurrence, in which he dissented from the denial of standing by the Appellate Division in *Board of Education of Central School District No. 1 v. Allen,* 27 A.D.2d 69, 276 N.Y.S.2d 234 (Third Dept.1966), *aff'd,* 20 N.Y.2d 109, 281 N.Y.S.2d 799, 228 N.E.2d 791 (1967), *aff'd,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) and he pointed out that under §§ 306 and 1706 of New York's Education Law

> "[a]ny school board member willfully disobeying any rule or regulation of the commissioner, may be removed from office by the commissioner after a hearing",

from which he deduced that

> "[B]y reason of the direct personal interests of the individual members of the board whose right to hold office may be directly affected, we are of the opinion that the plaintiffs could bring this lawsuit against this defendant."

276 N.Y.S.2d at 239–240.[7]

There is no danger in this case that the plaintiffs are likely to be removed from office. Certainly, the defendants could not remove them. Unlike the *Allen* plaintiffs, who were appointed by a commissioner, the plaintiffs here were elected to their offices by the voters of Hartford. They are under no risk from the defendants of direct or immediate injury to their respective rights to remain in office.

### B. *Violation of Oath*

■ Furthermore, nothing these plaintiffs are required to do can be regarded

---

**7.** No further light on the likelihood of removal from office is furnished by the decision of the New York Court of Appeals reversing the Appellate Division's denial of standing. *Allen v. Board of Education,* 20 N.Y.2d 109, 281 N.Y. S.2d 799, 228 N.E.2d 791 (1967). The only reference to the standing issue by that court is in footnote 1, 281 N.Y.S.2d at 803, 228 N.E.2d at 793: "[t]he writer and Judges Burke and Bergan agree with the Appellate Division majority that plaintiffs have no standing. Judge Keating, who is for affirmance on the merits, agrees with the dissenters that the plaintiffs do have standing." Judge Van Voorhis' dissent also discusses standing, following Justice Staley's analysis. 281 N.Y.S.2d at 805–06, 228 N.E.2d at 795.

as a violation of their oaths of office. This is not a case like *Allen,* where § 701 of New York's Education Law required the plaintiffs to provide books for students in parochial schools. This furnished the board members with the arguable ground that to do so would constitute an establishment of religion *specifically forbidden* by the first amendment.[8]

But the Constitution imposes no prohibition on providing funds for public education apart from the establishment clause. *See Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). And the mere fact that plaintiffs have taken an oath to uphold the Constitution cannot confer upon them a Quixotic brand of standing to challenge allegedly unconstitutional laws wherever they may be found. *City of Hartford v. Hills,* 408 F.Supp. 889 (D.Conn.1976) (appeal pending).

It cannot be denied that the plaintiffs have an official concern in the actions they take as members of the City Council, *i. e.,* setting the tax rate on property in Hartford, to raise the revenue needed to finance education and the other services provided by the City. They are vested with power to levy taxes to meet the burdens and expenses imposed by law. *See State ex rel. Bennett v. Glynn,* 154 Conn. 237, 244, 224 A.2d 711 (1966). But there is no conflict between this responsibility and their oaths to uphold the Constitution as it relates to their exercise of that power. Of course, the plaintiffs have raised no claim that their own taxing actions were unconstitutional. Indeed, in *Levitt v. Attorney General,* 111 Conn. 634, 646, 151 A. 171 (1930) the Connecticut Supreme Court of Errors quoted with approval from *Smyth v. Titcomb,* 31 Me. 272, 286 (1850):

"A public officer entrusted with the collection and disbursement of revenue, in any of the departments of [the] [*sic*] government, has no right to refuse to perform his ministerial duties, prescribed by law, because he may apprehend that others may be injuriously affected by it, or that the law may, possibly, be unconstitutional."

In fact, they do not challenge the purpose for which the money supplied by the state is to be spent. Rather, they attack the statutory formula providing for a flat, per-pupil payment to each town because that method results in heavier tax burdens on the larger towns. Thus, their levy of taxes for meeting expenses of education would in no way violate their oath to uphold the Constitution.[9]

---

**8.** *School District of Abington Township, Pennsylvania v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). In *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) the Court held that a federal taxpayer had standing to challenge a federal expenditure on the ground that it violated the establishment clause, distinguishing *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) because that broadside assertion of federal taxpayer standing to challenge any federal expenditure lacked the specific nexus between the expenditure and constitutional clause the Court found in *Flast.* While this distinction was not adverted to in the limited discussion of standing in *Allen,* it nonetheless bolsters the view that the board members might reasonably have considered that they were being required to act in violation of a constitutional prohibition.

**9.** The plaintiffs' brief asks us to assume that they might "decide to refuse to adopt a budget or release the funds necessary to fulfill their state-imposed duties of financing education for the City of Hartford," thereby exposing themselves to a ten dollar fine. Conn.Gen.Stat. Ann. § 7–104. That section provides in part:

"Any person elected to any town office . . . who neglects to perform the duties of the office, shall be fined not more than ten dollars."

We refuse to indulge in the fanciful assumption that the plaintiffs will refuse to provide any funds for public education, in retaliation for the State's refusal to enlarge its supplemental educational payments to the City. " . . . [S]uch speculative contingencies afford no basis for our passing on the substantive issues . . . ." *Hall v. Beals,* 396 U.S. 45, 49, 90 S.Ct. 200, 202, 24 L.Ed.2d 214, 218 (1969). *See also United States v. SCRAP,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254, 270 (1973).

### Section 1983 Liability

█ The plaintiffs also allege that they may be subjected to personal civil and criminal liability for action in violation of the Due Process and Equal Protection of the 14th Amendment.[10] However, it is the defendants—not the plaintiffs—who are charged with "discriminatorily and invidiously compel[ling] the City of Hartford and its inhabitants to assume costs of municipal services grossly disproportionate to that assumed by its contiguous towns." [11] In the City of Hartford, flat-rate taxes are laid on all taxable property in proportion to its assessed value. The *plaintiffs* do not allege that they will be required to act in violation of either due process or equal protection.

█ Furthermore, the plaintiffs are immune from liability for their actions, as legislators, in setting tax rates and allocating revenues. As the Supreme Court noted in *Scheuer v. Rhodes,* 416 U.S. 232, 243–44, 94 S.Ct. 1683, 1690, 40 L.Ed.2d 90, 101 (1974):

> "The Court had previously recognized that the Civil Rights Act of 1871 does not create civil liability for legislative acts by legislators 'in a field where legislators traditionally have power to act' *Tenney v. Brandhove,* 341 U.S. 367, 379, 71 S.Ct. 783, 789, 95 L.Ed. 1019 (1951)."

*See also Wood v. Strickland,* 420 U.S. 308, 316–17, 95 S.Ct. 992, 998, 43 L.Ed.2d 214, 222 (1975). The plaintiffs, insofar as they fix the tax rate and allocate the tax revenue to educational or other purposes, are acting as legislators. By statute in Connecticut "legislative body" as applied to cities and towns "shall mean the board of aldermen, council or other body charged with the duty of making annual appropriations . . . ." [12]

Even if the plaintiffs should be considered to be executive or administrative officials, rather than legislators, they would be immune from liability for their acts in setting the tax rates. Last term, in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Court established a two-part test which must be satisfied before immunity can be denied. It must be proved that the officials acted in "ignorance or disregard of settled, indisputable law . . . [or of a person's] . . . clearly established constitutional rights" or with a "malicious intention to cause a deprivation of constitutional rights . . . . ." 420 U.S. at 321–22, 95 S.Ct. at 1001, 43 L.Ed.2d at 225. *Cf. Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). At the present time the "indisputable law" is settled in *support* of their power to tax and to allocate revenue thus received for education and other municipal services. Texas' system of financing public education from local taxation is similar to Connecticut's, and was held *not* to violate the United States Constitution. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). In *Rodriguez* the Court held, 411 U.S. at 54–55, 93 S.Ct. at 1308, 36 L.Ed.2d at 55:

> "Moreover, if local taxation for local expenditures were an unconstitutional method of providing for education then it might be an equally impermissible means of providing other necessary services customarily financed largely from local property taxes, including local police and fire protection, public health and hospitals, and public utility facilities of various kinds. We perceive no justification for such a severe denigration of local property taxation and control as would follow from appellees' contentions. It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of

---

10. Amended Complaint ¶ 35.

11. Complaint ¶ 28(a).

12. Conn.Gen.Stat.Ann. § 1–1(m); § 7–452(4). *Cf. Chamberlain v. Bridgeport,* 88 Conn. 480, 91 A. 380 (1914).

the political subdivisions in which citizens live.

"In sum, to the extent that the Texas system of school financing results in unequal expenditures between children who happen to reside in different districts, we cannot say that such disparities are the product of a system that is so irrational as to be invidiously discriminatory."

An able and well-reasoned opinion by Judge Rubinow in *Horton v. Meskill,* 31 Conn.Sup. 377, 332 A.2d 113, 36 Conn. L.J. No. 33, at 19, (1975) (appeal pending) explicitly recognized that *"Rodriguez* is, therefore, controlling authority that the Connecticut system does not violate the equal protection clause of the United States Constitution." 31 Conn. Sup. at 380, 332 A.2d at 115. However, Judge Rubinow declared that Connecti-

cut's system "violate[d] article first, § 20, and article eighth, § 1, of the Connecticut constitution." [13]

Finally, it is clear, without further discussion, that the plaintiffs, no matter in which of the different capacities they may choose to sue, do not have standing to challenge the constitutionality of Connecticut's statute in this court. *See United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Committee To Stop The War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

This case is dismissed for lack of standing in the plaintiffs to sue.[14]

The foregoing may serve as the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

SO ORDERED.

---

**13.** 31 Conn.Sup. at 391, 332 A.2d at 120. In rejecting the equal protection challenge of the plaintiffs in *Rodriguez,* the Court held that education was not a fundamental right. Connecticut is free to create new fundamental rights for its citizens, and apparently has done so here. Article eighth, § 1 reads:

"There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

Article first, § 20 is Connecticut's equal protection clause. It provides that:

"No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

However, the holding in *Horton v. Meskill* that Connecticut's statute violates its own constitution plays no role in the adjudication of liability under 42 U.S.C. § 1983. *See Jones v. Marshall,* 528 F.2d 132, (2d Cir. 1975).

**14.** While the plaintiffs' lack of standing to sue is fatal to this action, and requires us to dismiss the complaint, the purposes they have attempted to accomplish may still be pursued by others, as exemplified by the state court case mentioned above, *Horton v. Meskill.* No question of standing arose in that case because the plaintiffs were students in the public schools of a town with less property available for taxation per pupil than other towns in the state.

A number of other challenges to state systems of financing public education have been adjudicated in state courts. In *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273, *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973) and *Sweetwater County Planning Committee For The Organization of School Districts v. Hinkle,* 491 P.2d 1234 (Wyo.1971), *juris. relinquished,* 493 P.2d 1050 (Wyo.1972) the Supreme Courts of New Jersey and Wyoming followed the lead set by California in *Serrano v. Priest,* 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), and held unconstitutional their states' systems for financing public education. The Supreme Court of Michigan followed suit in 1972, but pulled back one year later, in light of *Rodriguez. Milliken v. Green,* 389 Mich. 1, 203 N.W.2d 457 (1972), *vac.,* 390 Mich. 389, 212 N.W.2d 711 (1973).

Similar suits were unsuccessful in several states. *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973); *Spano v. Board of Education of Lakeland Central School District # 1, Town of Yorktown,* 68 Misc.2d 804, 328 N.Y.S.2d 229 (1972) (Sup.Ct.Wstchstr. Cnty.). The situation in Washington is unclear after *Northshore School District No. 417 v. Kinnear,* 84 Wash.2d 685, 530 P.2d 178 (1974). The federal courts have also been called upon to rule in several of these cases, including one pre-*Rodriguez* decision in which Judge Miles Lord denied motions to dismiss a challenge to Minnesota's system of public school financing. *Van Dusartz v. Hatfield,* 334 F.Supp. 870 (D.Minn.1971).